JAN BRITT LYNN, Plaintiff v. JAMES GREGORY LYNN and the ESTATE OF KENNETH LYNN and JAMES LYNN & SONS, INC., Defendants, and JAMES GREGORY LYNN, Third Party Plaintiff, v. PENNY W. LYNN as the Administratrix of THE ESTATE OF GEORGE KENNETH LYNN, PENNY W. LYNN, Individually and as the Guardian Ad Litem of MIRANDA KELSEY LYNN, JENNIFER KAY LYNN BACHINGER, BRANDON KENNETH LYNN, HOLLY KERRY LYNN and JAMES LYNN AND SONS, INC., Third Party Defendants

No. COA09-556

(Filed 16 February 2010)

**1. Corporations— Shareholders' Agreement—extrinsic evidence**

The admission of extrinsic evidence about a Shareholders' Agreement in an action involving the disputed transfer of shares in a closely held company was improper but immaterial. Taken as a whole, the intent of the Shareholders' Agreement was clear: the corporation was to remain closely held and shares were not to pass to outsiders. Issues surrounding the use of the term "restricted shares" were not determinative. Morever, assuming the extrinsic evidence was correctly admitted, that evidence clearly established that the parties intended for all of the shares to be restricted.

**2. Corporations— insurance policies—compliance with Shareholders' Agreement**

Evidence concerning insurance policies in an action to determine the transfer of shares in a closely held corporation was necessary to determine compliance with the Shareholders' Agreement, and was not presented as extrinsic evidence clarifying an ambiguity in the Agreement.

**3. Corporations— Shareholders' Agreement—compliance— findings supported by evidence**

The trial court's findings concerning compliance with a Shareholders' Agreement were supported by competent evidence.

LYNN v. LYNN

[202 N.C. App. 423 (2010)]

### 4. Corporations— Shareholders' Agreement—buy-sell provision—compliance

The trial court did not err by concluding that a buy-sell provision in a Shareholders' Agreement was complied with even though the insurance policy used to fund the provision was owned by an individual rather than the corporation. The intent of the Agreement was observed by the parties through their actions and course of dealing.

Appeal by third-party defendants from judgment entered 28 August 2008 by Judge Napoleon B. Barefoot, Jr. in Columbus County District Court. Heard in the Court of Appeals 4 November 2009.

*H. Griffith Garner and law student K. Scott Newton for plaintiff-appellee.*

*Don W. Viets, Jr. for third-party plaintiff-appellee.*

*Williamson, Walton & Scott, LLP, by Benton H. Walton, III and C. Martin Scott, II, The Odom Firm, PLLC, by Thomas L. Odom, Jr. and David W. Murray for third-party defendants-appellants.*

HUNTER, Robert C., Judge.

This case arises out of a dispute over a 55% ownership interest in James Lynn & Sons, Inc. ("James Lynn & Sons"), a closely held corporation. In a declaratory judgment entered 28 August 2008, the trial court held that third-party plaintiff James Gregory Lynn ("Gregory Lynn") was the rightful owner of that interest, making him the sole owner of the corporation. Third-party defendants James Lynn & Sons and Penny W. Lynn, in her individual capacity and as (1) administratrix of the estate of George Kenneth Lynn ("Kenneth Lynn") and (2) guardian ad litem for her four children, appeal the trial court's declaratory judgment. After careful review, we affirm.[1]

### Background

James Lynn & Sons was incorporated on 22 December 1988 by James Carl Lynn ("James Lynn") and his two sons, Gregory Lynn and Kenneth Lynn. On the day of incorporation James Lynn received 25.5 shares of stock and Kenneth and Gregory Lynn each received 12.25 shares of stock. Upon graduation from high school, Kenneth and Gregory Lynn were employed on a full-time basis with the corporation.

---

1. The third-party defendants, appellants in this action, are collectively referred to as "defendants."

On 23 December 1991 and 22 December 1993, additional shares of stock were issued to the three owners, the latter date being the last time that stock was ever issued for the corporation. As of 22 December 1993, James Lynn owned 51% of the issued stock and each son owned 24.5%. On 30 December 1993, the three corporate owners and their spouses entered into a Shareholders' Agreement,[2] which stated in pertinent part:

> WHEREAS, it is desired by each of the parties hereto that the business and affairs of the Corporation shall be conducted without interruption and shall not suffer from the delays and losses that frequently occur when it appears to [sic] shares in a closely held corporation may pass to outsiders[.]
>
> . . . .
>
> 3. SHARE CERTIFICATES. Each certificate representing restricted shares of the Corporation shall bare [sic] the following legend prominently displayed: "The shares represented by this Certificate, and the transfer thereof, are subject to the provisions of that certain Shareholders' Agreement, dated December 30, 1993, a copy of which is on file in, and may be examined at, the principal office of the Corporation."
>
> 4. PURCHASE UPON DEATH. *Upon the death of any Shareholder, his estate will sell, and the Corporation will purchase, at purchase value (as hereinafter defined), all of the restricted shares owned by the deceased Shareholder at the time of his death*; and all the parties hereto will take such action as may be required to effect such purchase, including without limitation any necessary recapitalization of the Corporation. The purchase price shall be paid immediately upon the receipt by the Corporation of the proceeds of any insurance on the life of the deceased Shareholder owned by the Corporation and payable to the Corporation or to the estate or heirs of the deceased Shareholder, to the extent of such proceeds.
>
> 5. PURCHASE VALUE (AGREED PRICE). *"Purchase value" means that life insurance proceeds in an amount not less than Seventy-Five Thousand ($75,000.00) Dollars*, which will be deemed automatically adjusted equitably and proportionately to reflect any stock dividend, stock split, or similar recapitalization affecting the shares. The aforementioned purchase value has

---

2. At times, the Shareholders' Agreement will be referenced as "the Agreement."

LYNN v. LYNN

[202 N.C. App. 423 (2010)]

been reviewed by all of the Shareholders and undersigned parties to the Agreement. The purchase value set forth herein shall be reviewed annually by all of the surviving Shareholders and will either be confirmed or revised upon such review on the basis of the then existing business and financial condition and prospects of the Corporation. The good faith decision of a majority of such Shareholders upon each such review shall be conclusive; and each such decision shall be noted in the attached Appendix "A" and endorsed by each such Shareholder. *It is the intent of the Shareholders that the receipt of the aforementioned insurance proceeds by the estate, or surviving spouse, or heirs of the deceased Shareholder shall be full and final satisfaction of said deceased Shareholder's interest in the James Lynn & Sons, Inc. Corporation.*

(Emphasis added). On 8 March 1993, prior to the execution of the Shareholders' Agreement, Kenneth and Gregory Lynn each purchased a $75,000 life insurance policy. Each brother was the record owner and beneficiary of the other brother's policy.

James Lynn died in October 1997 and his estate was administered by his wife, Doris Lynn. The corporation did not own insurance on the life of James Lynn because it was too expensive. The 51% interest in the corporation owned by James Lynn at the time of his death passed to his wife intestate. In March 2001, Gregory and Kenneth Lynn entered into a negotiated settlement with their mother in order to purchase the shares. On 11 April 2001, the parties signed a "Stock Purchase and Release Agreement" (the "release agreement") in which Gregory and Kenneth Lynn paid Doris Lynn $100,000 for the shares and to resolve other disputes between the parties. The release agreement referenced the Shareholders' Agreement stating:

WHEREAS, Corporation and its Shareholders executed a Shareholders' Agreement dated December 30, 1993, entered into by the Decedent, the Minority Shareholders, the Corporation, among others, . . . to sell and purchase, respectively, the Stock upon the death of the Decedent.

In May 2001, Kenneth and Gregory Lynn purchased additional life insurance on each other in the amount of $150,000. In October 2001, they increased the life insurance policy amount on each policy from $150,000 to $300,000 and also maintained the original $75,000 policies. In total, each brother had life insurance in the amount of $375,000. At some point in 2001, the brothers became owners of their

own life insurance policies. Subsequently, during 2005 and 2006, Kenneth Lynn named his wife as the beneficiary of his policy while Gregory Lynn named his children as beneficiaries of his policy. The evidence at the hearing revealed that at all times the corporation paid the premiums for every policy on the lives of Kenneth and Gregory Lynn. The brothers never reimbursed the corporation for those payments nor were the payments reported as individual income on the brothers' W-2 tax forms.

On 24 November 2003 Jan Lynn filed a complaint against her husband, Gregory Lynn, requesting, *inter alia,* divorce from bed and board and equitable distribution. On 8 July 2004, after disagreements arose between Kenneth and Gregory Lynn, the two negotiated a stock transfer by which Kenneth Lynn became the majority shareholder with a 55% ownership interest, and Gregory Lynn kept a 45% minority shareholder interest. No consideration was given to either party with regard to the stock transfer. Kenneth Lynn subsequently terminated Gregory Lynn's employment with the corporation, though he maintained his 45% ownership interest.

Gregory and Jan Lynn were divorced on 14 October 2005, but continued to engage in contentious litigation to resolve issues concerning equitable distribution. On 17 October 2006, Jan Lynn moved to join Kenneth Lynn as a party in the domestic dispute in order to establish that Kenneth Lynn was the majority shareholder in James Lynn & Sons, that Gregory Lynn was the minority shareholder, and that Gregory Lynn's shares were subject to equitable distribution.

On 17 October 2006, prior to a final equitable distribution order pertaining to the property of Jan Lynn and Gregory Lynn, Kenneth Lynn unexpectedly died intestate. Upon his death, his estate received the 55% ownership interest in James Lynn & Sons, and his widow, Penny Lynn, received the $375,000 life insurance proceeds. On 28 February 2007, Jan Lynn filed an emergency request to have a manager appointed for the corporation. On 17 September 2007 and 11 December 2007, over objections by the Estate of Kenneth Lynn and James Lynn & Sons, orders were entered joining the Estate of Kenneth Lynn and James Lynn & Sons and severing the equitable distribution claims from the other claims between Jan Lynn and Gregory Lynn. On 19 December 2007, Jan Lynn filed an amended complaint for equitable distribution, claiming that after Kenneth Lynn's death Gregory Lynn became the sole owner of James Lynn & Sons and that those shares previously owned by Kenneth Lynn were, therefore, at issue in the equitable distribution dispute. The

amended complaint included the estate of Kenneth Lynn and James Lynn & Sons as defendants.

On 25 January 2008, Gregory Lynn answered the amended complaint for equitable distribution and asserted a third-party complaint against the corporation and Penny Lynn in her individual capacity, as administratrix of the estate of Kenneth Lynn, and as guardian ad litem for her four children. Gregory Lynn claimed that pursuant to the Shareholders' Agreement, he became the sole owner of the corporation upon his brother's death and subsequent payment of life insurance proceeds to Penny Lynn.

On 26 February 2008, Jan Lynn filed a motion for declaratory judgment regarding the nature and extent of Gregory Lynn's ownership interest in the corporation. On 28 February 2008, Penny Lynn filed an answer to the amended complaint and filed a counterclaim requesting a declaratory judgment that would declare her the rightful owner of her deceased husband's 55% interest in James Lynn & Sons.[3]

On 16 July 2008, a hearing was conducted by Judge Napoleon B. Barefoot, Jr. in Columbus County District Court.[4] The parties stipulated into evidence the Shareholders' Agreement and copies of the parties' share certificates. Upon review of the Shareholders' Agreement and hearing arguments of counsel, the trial court determined that there were ambiguities in the Shareholders' Agreement and decided to hear further evidence. The principal ambiguity, according to the trial court, concerned the term "restricted shares," which was not defined in the Shareholders' Agreement. The meaning of this term was critical to the trial court's determination of ownership because the "Purchase Upon Death" clause of the Shareholders' Agreement specified that any life insurance proceeds paid upon the death of one of the shareholders would serve as complete payment to purchase "restricted shares" inherited by an heir of the deceased—in this case, Penny Lynn.

Plaintiffs contended that all stock distributed prior to the execution of the Shareholders' Agreement was in fact restricted because it could not be transferred to anyone outside of the family.[5] Further-

3. For ease of reference, plaintiff Jan Lynn and third-party plaintiff Gregory Lynn are at times referred to collectively as "plaintiffs" as their positions at the declaratory judgment hearing were identical.

4. James Lynn & Sons was not represented by counsel at the hearing.

5. No shares were distributed after the Shareholders' Agreement was signed.

more, the Shareholders' Agreement provided that upon the death of a shareholder, the life insurance paid (a minimum of $75,000) would serve to repurchase the shares inherited by the decedent's heirs. Therefore, according to plaintiffs, because Kenneth Lynn owned only restricted shares of stock, and upon his death Penny Lynn inherited that stock and received $375,000 in life insurance proceeds, the stock was effectively purchased from her by the corporation, making Gregory Lynn the sole shareholder. Defendants contended that the language of the Shareholders' Agreement was clear and that Kenneth Lynn's shares did not specify on the legend that they were restricted. Accordingly, the proceeds of the life insurance policy did not effectively purchase the shares and Penny Lynn was, therefore, the rightful owner of her late husband's 55% interest in the corporation.

At the hearing, over defendants' objections, Harold Pope, the attorney who drafted the Shareholders' Agreement, testified that all shares issued by the corporation were "restricted" and that the omission of the restricted notation on the shares was immaterial. Plaintiffs presented documentary evidence that the brothers had purchased life insurance totaling $375,000 for each brother. Internal documents from the life insurance company showed that the applications for insurance noted that the insurance was to fund a "Partnership Buy/Sell Agreement." The brothers' applications also referenced each other and stated that each policy should be "issue[d] in conjunction with [the other brother's policy] . . . as part of a privately owned Partnership Buy/Sell Agreement." Glenn Ray, the life insurance agent who sold Gregory and Kenneth Lynn the policies, also testified regarding the intent of the purchase stating that the policy was to fund a buy-sell agreement. Faye Simmons, the corporation's office secretary testified that the corporation paid all premiums for the life insurance policies. Alan Thompson, a CPA who performed corporate account services for the corporation, testified that he was aware of the Shareholders' Agreement and it was his understanding that the life insurance was meant to fund a buy-sell agreement. Plaintiffs also submitted the release agreement entered into by the brothers and their mother, which references the Shareholders' Agreement and its purpose—"to sell and purchase . . . the Stock upon the death of the Decedent."

On 28 August 2008, the trial court issued an order in which it made findings of fact and conclusions of law based on the documents and evidence presented at the hearing. The court ordered: (1) "[t]hat the Estate of George Kenneth Lynn, administered by Penny W. Lynn,

shall transfer the decedent's stock shares of James Lynn & Sons, Inc. to said corporation on or before the 15th day of September, 2008"; (2) "[t]hat the receipt of the full life insurance proceeds from the policies owned by George Kenneth Lynn hereby constitute full and final payment for the stock shares owned by the decedent George Kenneth Lynn, pursuant to the Shareholders' Agreement executed December 30, 1993"; (3) "[t]hat this transfer shall fully and finally resolve the issues of stock ownership in James Lynn & Sons, Inc."; and (4) "[t]hat James Gregory Lynn shall be the sole owner of all shares of stock and sole owner of James Lynn & Sons, Inc." The third-party defendants now appeal the trial court's declaratory judgment.[6]

## Standard of Review

" 'The Declaratory Judgment Act, [N.C. Gen. Stat. §] 1-253 *et seq.*, affords an appropriate procedure for alleviating uncertainty in the interpretation of written instruments and for clarifying litigation.' " *Hejl v. Hood, Hargett & Associates, Inc.*, —— N.C. App. ——, ——, 674 S.E.2d 425, 427 (2009) (quoting *Bellefonte Underwriters Ins. Co. v. Alfa Aviation*, 61 N.C. App. 544, 547, 300 S.E.2d 877, 879 (1983)). " 'The standard of review in declaratory judgment actions where the trial court decides questions of fact is whether the trial court's findings are supported by any competent evidence. Where the findings are supported by competent evidence, the trial court's findings of fact are conclusive on appeal.' " *Cross v. Capital Transaction Grp., Inc.*, 191 N.C. App. 115, 117, 661 S.E.2d 778, 780 (2008) (quoting *Lineberger v. N.C. Dep't of Corr.*, 189 N.C. App. 1, 7, 657 S.E.2d 673, 678, *aff'd per curiam in part and disc. review improvidently allowed in part*, 362 N.C. 675, 669 S.E.2d 320 (2008)). " 'However, the trial court's conclusions of law are reviewable *de novo.*' " *Id.* (quoting *Browning v. Helff*, 136 N.C. App. 420, 423, 524 S.E.2d 95, 98 (2000)). Questions of contract interpretation are also reviewed *de novo. Hickory Orthopaedic Center, P.A. v. Nicks*, 179 N.C. App. 281, 291, 633 S.E.2d 831, 837 (2006).

## Discussion

### I. Admission of Extrinsic Evidence

[1] Defendants first contend that because the Shareholders' Agreement was plain and unambiguous on its face, the trial court

---

6. Although an equitable distribution order had not been entered at the time of this appeal, the declaratory judgment was a final judgment from the district court regarding ownership of the shares, and, therefore, this appeal is not interlocutory. N.C. Gen. Stat. § 7A-27(c) (2007).

was required to rule strictly upon review of the Agreement itself and no extrinsic evidence was admissible, including, *inter alia*, witness testimony and documentary evidence concerning the intent behind the Agreement. Specifically, defendants argue that the Shareholders' Agreement clearly states in the "Purchase Upon Death" clause that the deceased shareholder's estate would be required to sell all "restricted shares" back to the corporation and that the corporation would purchase those shares through "the proceeds of any insurance on the life of the deceased [s]hareholder owned by the [c]orporation and payable to the [c]orporation or the estate or heirs of the deceased [s]hareholder . . . ." Defendants claim that the share certificates did not indicate that the shares owned by Kenneth Lynn were restricted and that the corporation did not own any life insurance on the life of Kenneth Lynn. Accordingly, defendants assert that Penny Lynn was not required to transfer the 55% interest she inherited back to the corporation. Based on this logic, Penny Lynn would keep the life insurance proceeds in the amount of $375,000 as well as the shares she inherited. First, we must determine whether the Shareholders' Agreement is, in fact, ambiguous.

"Since consensual arrangements among shareholders are *agreements*—the products of negotiation—they should be construed and enforced like any other contract so as to give effect to the intent of the parties as expressed in their agreements . . . ." *Blount v. Taft*, 295 N.C. 472, 484, 246 S.E.2d 763, 771 (1978). "With all contracts, the goal of construction is to arrive at the intent of the parties when the contract was issued. The intent of the parties may be derived from the language in the contract." *Mayo v. North Carolina State University*, 168 N.C. App. 503, 508, 608 S.E.2d 116, 120 (2005) (internal citation omitted), *aff'd per curiam*, 360 N.C. 52, 619 S.E.2d 502 (2005).

"It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." *Carolina Power & Light Co. v. Bowman*, 229 N.C. 682, 693-94, 51 S.E.2d 191, 199 (1949). "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court . . . and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Piedmont Bank & Trust Co. v. Stevenson*, 79 N.C. App. 236, 240, 339 S.E.2d 49, 52, *aff'd per curiam*, 317 N.C. 330, 344 S.E.2d 788 (1986). However, "[e]xtrinsic evidence may be consulted when the plain language of the contract is ambiguous." *Brown v. Ginn*, 181 N.C. App. 563, 567,

640 S.E.2d 787, 790 (2007) (citations omitted). "Whether or not the language of a contract is ambiguous . . . is a question for the court to determine." *Piedmont Bank and Trust Co.*, 79 N.C. App. at 241, 339 S.E.2d at 52. In making this determination, "words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible . . . ." *Id.* "[W]here the language presents a question of doubtful meaning and the parties to a contract have, practically or otherwise, interpreted the contract, the courts will ordinarily adopt the construction the parties have given the contract *ante litem motam.*" *Davison v. Duke University*, 282 N.C. 676, 713-14, 194 S.E.2d 761, 784 (1973). The court must not, however, "under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978).

A. Evidence Concerning the Term "Restricted Shares"

Here, the trial court found as fact:

That the Shareholder's Agreement had some ambiguities in it as in some paragraphs it referred to "shares" and in other paragraphs it referred to "restricted shares." That the agreement further provides that restricted shares of stock would be issued and there would be a legend prominently displayed on the shares of stock indicating they were restricted and subject to the Shareholders' Agreement dated December 30, 1993. However, no restricted stock or any other stock of any kind was issued after the Shareholders' Agreement on December 30, 1993. . . . Also, the $75,000.00 life insurance policies [were] already in effect between the brothers when the Shareholders' Agreement was signed.

The Agreement did not specifically define the term "restricted shares." Due to the perceived ambiguity by the trial court, further evidence was heard.

Upon careful review of the Shareholders' Agreement, we agree with defendants that there is no ambiguity in the Agreement, and, more specifically, we find no ambiguity in the term "restricted shares." Accordingly, extrinsic evidence admitted solely for the purpose of defining "restricted shares" under the Shareholders' Agreement was improper. *See Piedmont Bank & Trust Co.*, 79 N.C. App. at 240, 339 S.E.2d at 52. Nevertheless, we find no error in the trial court's ultimate determination—that the shares owned by

LYNN v. LYNN

[202 N.C. App. 423 (2010)]

Kenneth Lynn were restricted and that the life insurance proceeds were intended to purchase those shares from his estate. Because we reach the same conclusion as the trial court based strictly on a reading of the Shareholders' Agreement, we find the admission of extrinsic evidence to clarify the term "restricted shares" to be immaterial in this case. *See Starco, Inc. v. AMG Bonding & Ins. Serv., Inc.*, 124 N.C. App. 332, 335, 477 S.E.2d 211, 214 (1996) ("[T]o obtain relief on appeal, an appellant must not only show error, . . . appellant must also show that the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action.").

Our holding that the Shareholders' Agreement is unambiguous is based, in part, on the clear intent stated in the Agreement. "While the intent of the parties is at the heart of a contract, intent is a question of law where the writing is free of any ambiguity which would require resort to extrinsic evidence or the consideration of disputed fact." *Martin v. Ray Lackey Enterprises*, 100 N.C. App. 349, 354, 396 S.E.2d 327, 330 (1990). The Agreement states:

WHEREAS, all of the issued and outstanding shares of the Corporation are owned and held of record as follows:

| SHAREHOLDER | NUMBER OF SHARES |
| --- | --- |
| James Carl Lynn[] | 51% |
| George Kenneth Lynn | 24.5% |
| James Gregory Lynn | 24.5% |

WHEREAS, it is desired by each of the parties hereto that the business and affairs of the Corporation shall be conducted without interruption and shall not suffer from the delays and losses that frequently occur when it appears to [sic] shares in a closely held corporation may pass to outsiders[.]

. . . .

1. TRANSFER TO RELATED PARTY. Each Shareholder shall be free to transfer, during his lifetime or by testamentary transfer, all or [part of his] shares to any party related by blood; but such transferee of those shares shall thereafter be bound by all of the provisions of this Agreement, and no further transfer of such shares shall be made by such transferee except back to the Shareholder who originally owned them, or to a related party of such transferee, or except in accordance with the provisions of Paragraph 2. hereinbelow.

The Agreement further states that prior to the transfer of any "restricted shares, except as permitted under Paragraph 1[,]" the shareholder seeking to transfer his or her shares is required to first submit to the corporation an "offer to sale" the shares. If the corporation rejects the offer, or if the offer lapses, then the other shareholders must also receive the opportunity to purchase the shares for the same price and under the same terms as the offer made to the corporation. The Agreement then provides for the purchase of "restricted shares" upon the death of a shareholder with the proceeds of life insurance owned by the corporation, and payable to the heirs of the decedent. Multiple provisions are, therefore, included in the Agreement to ensure that the corporation remain closely held and not pass to "outsiders."[7] Paragraph one uses the term "shares" and limits the transfer of shares to blood relatives only. Subsequently, the term "restricted shares" is used in other provisions regarding transfer of shares. Due to the extensive restrictions on alienation of shares, we find that all shares that had been issued prior to the execution of the Agreement were "restricted" and that the term "restricted shares" was not limited to those shares distributed prospectively as defendants claim. In fact, no shares were ever issued after the execution of the Agreement, and the Agreement lists the percentage interest owned by each shareholder at the time the Agreement was executed.

The type of restrictions found in the Shareholders' Agreement at issue in this case are common in closely held corporations.

> In family owned corporations, or other corporations in which all shares of stock are held by a relatively small number of shareholders, it is not unusual for all shareholders to agree that the corporation, or the other shareholders, will be given the first opportunity to purchase the shares of a terminated or retiring shareholder. . . . These *restrictions* allow shareholders to choose their business associates, *to restrict ownership to family members*, and to ensure congenial and knowledgeable associates.

*Crowder Const. Co. v. Kiser*, 134 N.C. App. 190, 196-97, 517 S.E.2d 178, 184 (emphasis added) (internal citation omitted), *disc. review denied*, 351 N.C. 101, 541 S.E.2d 142 (1999).

Also relevant to our determination that the Shareholders' Agreement is not ambiguous is the fact that the brothers specifically purchased $75,000 in life insurance prior to executing the Shareholders'

___

7. Jan Lynn, Penny Lynn, and Doris Lynn signed the Agreement although they were not shareholders at that time.

Agreement.[8] Clearly the policies in the amount of $75,000, the exact amount stated in the "Purchase Value" provision of the Agreement, was meant to purchase those shares already distributed in the event that one of the shareholders died. These shares are designated as "restricted" in the Agreement. The Agreement explicitly states that "*[i]t is the intent of the Shareholders* that the receipt of the afore-mentioned insurance proceeds *by the estate,* or surviving spouse, or heirs of the deceased Shareholder shall be *full and final satisfaction of said deceased Shareholder's interest* in the James Lynn & Sons, Inc. Corporation." (Emphasis added). The term "interest" is used here as opposed to "restricted shares," which evidences the intent that all shares owned by the decedent be covered.

We recognize, as did the trial court, that the Agreement alternates between use of the terms "shares" and "restricted shares"; however, we do not find that this creates an ambiguity in the Agreement where the intent of the parties is clear from the document as a whole. "Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." *Jones v. Casstevens,* 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) (quoting *Simmons v. Groom,* 167 N.C. 312, 316, 83 S.E. 471, 473 (1914)). Viewing the Agreement as a whole, we find the intent to be clear and unambiguous. Each share distributed was subject to specific transfer limitations and was, therefore, restricted. The parties intended these "restricted shares" to be gov-erned by the "Purchase Upon Death" and "Purchase Value" provisions of the Agreement.

We also acknowledge that the Agreement mandates specific lan-guage on the legend of restricted shares that was not present on the shares distributed in this case, but we do not find that fact to be determinative. The failure to indicate on the legends that the shares were restricted would perhaps impact a transfer to a good faith pur-chaser who would not have notice that the shares were restricted. *See* U.C.C. § 8-204 (1994) ("A restriction on transfer of a security imposed by the issuer, even if otherwise lawful, is ineffective against a person without knowledge of the restriction . . . ."). However, that is not the case here. Penny Lynn signed the Shareholders' Agreement and was, therefore, aware of the clear intent of the Agreement and the limita-

---

8. As discussed *infra,* evidence concerning the purchase of life insurance was not admitted to clarify an ambiguity; rather, the evidence was admitted to show compli-ance with the Agreement.

tions on transfer. *Mosely v. WAM, Inc.*, 167 N.C. App. 594, 599, 606 S.E.2d 140, 143 (2004) ("When a party affixes his signature to a contract, he is manifesting his assent to the contract.").

Assuming, *arguendo*, that we found the Agreement to be ambiguous, thus requiring extrinsic evidence to clarify the intent of the parties, the evidence presented at the hearing clearly establishes that the parties intended for all shares in existence to be "restricted" and that the parties intended to abide by the "Purchase Upon Death" provision. Harold Pope, the attorney who drafted the Shareholders' Agreement, testified that all shares issued by the corporation were "restricted" and that the omission of the restricted notation on the shares issued prior to the execution of the Agreement did not make those shares unrestricted. He also pointed to paragraph five of the Agreement, which states that the intent of the shareholders was for the insurance proceeds to purchase the decedent's interest in the corporation, which would include all shares, and claimed that he always includes "a sentence or two, or paragraph if necessary, to state the intent of the parties."

The most revealing piece of extrinsic evidence presented to the trial court was the release agreement signed by Kenneth Lynn, Gregory Lynn, and their mother, Doris Lynn, in which the Shareholders' Agreement was referenced as well as the intent of the Agreement—"to sell and purchase . . . the Stock upon the death of the Decedent." All three individuals who signed the release agreement also signed the Shareholders' Agreement. *See Nicks*, 179 N.C. App. at 290, 633 S.E.2d at 836 ("Prior course of conduct evidence is more compelling when the prior conduct involved the same parties in the same relation to each other."). Even though the corporation did not own life insurance on James Lynn, the parties still honored the intent of the Agreement. Doris Lynn accepted $100,000 as full and final satisfaction for her deceased husband's shares, and to settle other disputes between the parties.

In sum, we find that there was no ambiguity in the Shareholders' Agreement. All shares owned by James Lynn and his sons at the time the Agreement was executed were "restricted" and subject to the terms of the Shareholders' Agreement, including the "Purchase Upon Death" provision. Even if we found that the Agreement was ambiguous, as the trial court did, the extrinsic evidence presented at the hearing overwhelmingly supports our interpretation.

## B. Evidence Concerning the Life Insurance Policies

**[2]** Defendants further dispute the admission of evidence concerning the purpose of the life insurance policies. Specifically, testimony and documents admitted tending to show that the life insurance was purchased to fund a "buy-sell agreement."

The trial court did not find that there was an ambiguity in the Shareholders' Agreement concerning the insurance provision. Practically speaking, once the trial court determined that the shares owned by Kenneth Lynn were restricted, evidence was required to show whether the parties had complied with the insurance provision of the Shareholders' Agreement, which specified that life insurance owned by the corporation on the life of the deceased shareholder would serve as full payment for shares inherited by an heir of the decedent.

We conclude that all evidence submitted concerning the insurance policies was necessary to the determination of the action and was not presented as extrinsic evidence to clarify an ambiguity. The trial court did not, therefore, err in reviewing this evidence.

## II. Findings of Fact

**[3]** Defendants further assign error to most of the trial court's findings of fact and allege that they are either irrelevant or not based on competent evidence. Because we have determined that the terms of the Shareholders' Agreement are not ambiguous, and that Kenneth Lynn's shares were restricted pursuant to the express intent of the Agreement, we need not address defendants' arguments concerning findings that were based on extrinsic evidence or findings regarding the intent of the Agreement itself. We will, however, address assignments of error pertaining to compliance with the Agreement.

The trial court found as fact, based on the evidence presented, that while the brothers technically "owned" the multiple life insurance policies, the intent of the brothers in purchasing the policies was to fund the buy-sell agreement, as provided for in the "Purchase Upon Death" and "Purchase Value" provisions of the Shareholders' Agreement. The court further found that at all times the corporation paid the policy premiums and were not reimbursed by the brothers; the premium payments were not included as income on the brothers' W-2 tax forms; and that the documents pertaining to the policies were kept at the corporate office.

Testimony from multiple sources and documentary evidence supported the trial court's findings. Glenn Ray, an agent with Farm Bureau Life Insurance, testified that prior to executing the Shareholders' Agreement, the brothers each purchased $75,000 in life insurance. The forms indicated that the purpose of buying the insurance was to fund a buy-sell agreement. The brothers subsequently purchased additional insurance such that the life of each brother was insured for $375,000. Faye Simmons, who had served as the corporation's office secretary since 1994, testified that the corporation paid the premiums on the policies; that the brothers never reimbursed the corporation; and that the documents concerning the policies were kept in the corporate office. Alan Thompson, a CPA who assisted the corporation with its taxes, testified that he was aware that a buy-sell agreement was in effect and that it was funded by the brothers' life insurance policies. There was no contrary evidence presented. Accordingly, we hold that the trial court's findings were supported by competent evidence.

### III. Conclusions of Law

[4] Defendants assign error to all of the trial court's conclusions of law pertaining to the interpretation of the Agreement, the intent of the Agreement, and compliance with the Agreement. The trial court concluded:

2. That the intent and purpose of the Shareholders' Agreement dated December 30, 1993 is clearly stated in the plain language of the Agreement as is found in Paragraphs 4 and 5 of said Agreement. That the Shareholders' Agreement dated December 30, 1993 was a valid Buy/Sell Agreement supported by consideration and is binding on the parties.

3. That the shareholders of James Lynn & Sons, Inc. complied with the provisions of the Shareholders Agreement upon the death of Mr. James C. Lynn, Sr. in 1997 and upon the death of George Kenneth Lynn in 2006.

4. That Penny Lynn received the proceeds from the Life Insurance required in the Shareholder's Agreement upon her husband Kenneth Lynn's death and [to] comply with said agreement she as Administrator of Kenneth's estate should be required to transfer Kenneth Lynn's shares of James Lynn & Sons, Inc. stock [sic] [in] said corporation to be disbursed to Gregory as required in the Agreement.

5. That pursuant to Rule 57 of the North Carolina Rules of Civil Procedure the court declares that all terms of the Shareholders' Agreement have been complied with and the agreement shall be enforced with ownership of the shares of James Lynn & Sons, Inc.[,] stock currently held by the Estate of George Kenneth Lynn or his widow Penny Lynn[,] to be transferred through [the] Corporation to James Gregory Lynn their rightful owner.

We find no error in the trial court's conclusions of law. Based on our holdings, *supra*, with regard to interpretation and intent of the Agreement, we need only specifically address the trial court's conclusion of law that "the shareholders of James Lynn & Sons, Inc. *complied* with the provisions of the Shareholders' Agreement . . . upon the death of Kenneth Lynn . . . ." (Emphasis added). The trial court's findings establish that the brothers "owned" the life insurance policies. The Agreement states that life insurance "owned by the Corporation and payable to the Corporation or to the estate or heirs of the deceased Shareholder, to the extent of such proceeds[]" would serve as full payment for stock inherited. It is undisputed that the insurance proceeds were paid to the estate of the deceased shareholder. Defendants argue that because the corporation did not technically "own" the policies, the Agreement was not complied with and Penny Lynn is entitled to the insurance proceeds and the shares she inherited.[9] We disagree.

Kenneth Lynn originally named his brother as owner of his life insurance policy in the amount of $75,000 and he made it clear in his application that the policy was being purchased to fund a buy-sell agreement. He further referenced his brother's application and noted that his policy should be "issue[d] in conjunction with [Gregory Lynn's policy] . . . as part of a privately owned Partnership Buy/Sell Agreement."[10] Kenneth Lynn also purchased an additional policy in the amount of $150,000 and then increased that policy to $300,000. Gregory Lynn was listed as the owner of these policies as well. On 2 August 2001, Kenneth Lynn requested that ownership of his policies be changed so that he would become the owner of the policies rather than his brother. Regardless of who was the record owner, all prem-

---

9. Defendants cite no authority for their argument in violation of N.C. R. App. P. 28(b)(6).

10. Viewed in context, the partnership agreement referenced is, in fact, the Shareholders' Agreement at issue.

iums on Kenneth Lynn's various policies from 1993 until his death in 2006 were paid by the corporation.

As the trial court acknowledged, the policies were owned by Kenneth Lynn, not the corporation, at the time of his death; however, this does not defeat the clear intent of the Shareholders' Agreement, which was observed by the parties through their actions and course of dealing since its execution. The evidence shows that the brothers intended for the life insurance policies to fund a buy-sell agreement. The Shareholders' Agreement expressed the intent of the shareholders that the proceeds of the life insurance policies would serve as full payment for any interest, which would include all shares, in the corporation inherited by the estate of a deceased shareholder. We must honor the intent of the Agreement, viewed as a whole. *State v. Philip Morris USA Inc.*, —— N.C. App. ——, ——, 669 S.E.2d 753, 756 (2008) ("Intent is derived not from a particular contractual term but from the contract as a whole.") (citation and quotation marks omitted), *aff'd*, 363 N.C. 623, 685 S.E.2d 85 (2009). In so doing, we hold that the trial court did not err in concluding as a matter of law that "the shareholders of James Lynn & Sons, Inc. complied with the provisions of the Shareholders' Agreement . . . upon the death of Kenneth Lynn . . . ."

### Conclusion

We hold that the Shareholders' Agreement is not ambiguous; the trial court improperly considered extrinsic evidence to interpret the contract; Kenneth Lynn's shares were "restricted" and subject to the "Purchase Upon Death" provision of the Agreement; the trial court's findings of fact regarding compliance with the Agreement were supported by competent evidence; and the trial court's conclusions of law are not erroneous in any respect. Accordingly, we affirm the declaratory judgment, which ordered the Estate of Kenneth Lynn, administered by Penny Lynn, to transfer the shares inherited intestate from Kenneth Lynn to James Lynn & Sons, Inc.

Affirmed.

Judges CALABRIA and GEER concur.