Jackson v. MH Master Holdings, LLLP, 2025 NCBC 21.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23CVS005013-100

JEFF JACKSON, Attorney General,
*ex rel.* DOGWOOD HEALTH TRUST,

Plaintiff,

v.

MH MASTER HOLDINGS LLLP,

Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

1. This case centers on the terms of an Amended and Restated Asset Purchase Agreement (APA) memorializing MH Master Holdings LLLP's (HCA[1]) acquisition of a six-campus hospital system serving western North Carolina (Mission). In its Motion for Partial Summary Judgment (Motion), HCA asks the Court to determine that the language "shall not discontinue" in Section 7.13(a) of the APA is unambiguous and to interpret the language as a matter of law. (Mot. Partial Summ. J., ECF No. 69.)

2. Having considered the Motion, the related briefs, other appropriate matters of record, and the arguments of counsel at a hearing held on 12 December 2024, the Court hereby **DENIES** the Motion.

---

[1] Pursuant to Section 7.10 of the APA, MH Master Holdings LLLP is authorized to do business as HCA. Therefore, for purposes of this Motion, the Court refers to Defendant as "HCA."

*North Carolina Department of Justice, by Brian Rabinovitz, Llogan R. Walters, Daniel P. Mosteller, Danielle Wilburn Allen, and Marc D. Brunton, for Plaintiff Attorney General Jeff Jackson ex. rel. Dogwood Health Trust.[2]*

*Latham & Watkins, LLP, by Nathan A. Sandals and Chase A. Chesser; Kirton McConkie, by Allen Gardner; and Roberts & Stevens, PA, by Phillip T. Jackson, John Noor, and David Hawisher, for Defendant MH Master Holdings, LLLP.*

Earp, J.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

3.     The Court does not make findings of fact when ruling on a motion for summary judgement.  Instead, the Court summarizes the material facts it considers to be uncontested.  *See, e.g., Vizant Techs., LLC v. YRC Worldwide, Inc.*, 373 N.C. 549, 551 (2020).

4.     Section 7.13(a) of the APA and its accompanying schedule speak to HCA's obligation to continue certain services during the ten-year period following its acquisition of Mission, barring certain defined contingencies or extenuating circumstances.  (Am. Compl., Ex. 1 [APA], Section 7.13(a), ECF No. 50.1.)

5.     Section 7.13(a) states in relevant part:

Unless otherwise consented to in writing by the Advisory Board for a period of ten (10) years immediately following the Closing Date, Buyer **shall not discontinue the provision of the services set forth on Schedule 7.13(a)** (the "Mission Hospital / CarePartners Services") at the Mission Hospital Campus Facility, the Community CarePartners Facilities or the Mission Children's Hospital Reuter Outpatient Center, as applicable, subject to Force Majeure making the provision of such services impossible or commercially unreasonable (but only for the period of Force Majeure and the applicable Remediation Period).

---

[2] Jessica Vance Sutton, Jasmine McGhee, South A. Moore and Sarah G. Boyce also appeared on behalf of the Attorney General at oral argument but have since been permitted to withdraw as counsel in this matter.  (*See* ECF Nos. 104, 107, 114.)

(APA, Section 7.13(a) (emphasis added)).

6.      The accompanying Schedule 7.13(a) specifies the services:

- **Behavioral Health** – child, adolescent and adult inpatient and partial hospitalization outpatient services.
- **Cardiac Services** – Cardiology, Interventional Cardiology, Electrophysiology, Cardiac Surgery and rehabilitation services.
- **Emergency and Trauma services** generally consistent with the current Level II Trauma Program with emergency services for pediatrics and adults, ground/air medical transport services and forensic nursing services.
- **General Medicine Services** – hospitalist, gastroenterology, infectious disease, nephrology, pulmonary/critical care, neurology, and palliative care services.
- **Imaging and Diagnostic Services** – CT, Cardiac CT, MRI, neuro-interventional and interventional radiology and high-risk mammography services.
- **Neuro Trauma Services.**
- **Obstetrical services** – OB emergency, labor, delivery, post-partum and high-risk maternal fetal services.
- **Oncology Services** – inpatient and outpatient cancer services, radiation therapy, surgery, chemotherapy, and infusion services.
- **Pediatric Services** – Level III neonatal intensive care and associated transport, and pediatric inpatient/intensive care.
- **Surgical Services** – bariatric, cardiac, ear/nose/throat, breast, endoscopy, gynecologic/gynecologic oncology, neuro-spine, oncology, orthopedic trauma, orthopedic pediatrics, cardiothoracic, trauma, ophthalmology, plastics, urology, vascular, and minimally invasive and robotic surgery.

(APA Schedule 7.13(a).)

7.      Pursuant to Section 55A-12-02(g) of the North Carolina General Statutes, the Attorney General conducted a review of the APA prior to the transaction closing.  The purpose of the review was, among other things, to ensure that the price paid for the assets was fair and that any charitable assets remained dedicated to a charitable purpose.  (Am. Compl. ¶ 32, ECF No. 50.)  As part of the review process,

the Attorney General's Office requested and reviewed a wealth of information submitted by the parties.

8.      The Attorney General identified several matters of concern with respect to the deal. As a result, counsel in the Attorney General's Office were tasked with negotiating modifications to the language of the APA. (Am. Compl. ¶ 33.)

9.      Having completed the negotiations, on 16 January 2019, the Attorney General issued a Letter of Nonobjection detailing the agreed changes to the APA. (Def.'s Answ. and Countercls. Ex. 1, ECF No. 55.1.) It is undisputed that the negotiations did not result in a change to the language of Section 7.13(a) or its schedule. (Decl. of Att'y Gen'l Stein [Stein Decl.] § 5, ECF No. 94.6.)

10.     The transaction closed in January 2019. (Am. Compl. ¶ 29.)

11.     On 14 December 2023, the Attorney General,[3] acting on behalf of Dogwood Health Trust,[4] initiated this action. The Attorney General alleges that HCA has breached the APA by failing to provide the emergency and trauma services, as well as the oncology services, required by the APA. HCA denies these allegations.

---

[3] On 1 January 2025, Jeff Jackson took the oath of office to become North Carolina's Attorney General and lead the North Carolina Department of Justice, replacing Joshua H. Stein, the original Plaintiff in this action.

[4] Dogwood Health Trust is a nonprofit corporation identified as the "Foundation" in the APA. (Def.'s Countercls. ¶ 6, ECF No. 55.) According to its website, "[i]n addition to investing in the health and wellness of our region, one of Dogwood Health Trust's roles is to ensure that HCA remains in compliance with the terms it agreed to when it purchased the assets of Mission Health System." (https://dogwoodhealthtrust.org/about/independent-monitor/. Last visited 14 April 2025.) Section 13.13(b) of the APA gives the Attorney General the right to enforce Section 7.13(a) on behalf of Dogwood Health Trust.

12. On 26 July 2024, HCA filed this Motion seeking partial summary judgment "on the proper textual construction of the words 'shall not discontinue' in Section 7.13(a) of the [APA]." HCA maintains that the Attorney General's claims for breach of the APA turn on the meaning of these three words.

13. After full briefing, the Court held a hearing on the Motion on 12 December 2024, at which all parties were represented by counsel. (Not. Hr'g., ECF No. 95.) The Motion is now ripe for disposition.

## II. LEGAL STANDARD

14. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that [the movant] is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c).

15. Genuine issues of material fact are those "which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and internal quotation marks omitted).

16. In reviewing a motion for summary judgment, the Court must consider all evidence in the light most favorable to the non-moving party. *Belmont Ass'n v. Farwig*, 381 N.C. 306, 310 (2022). Parties moving for summary judgment have the

burden of establishing the lack of any triable issue of fact. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

17. A movant may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). Should the movant satisfy its burden, "then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e) (emphasis omitted)).

18. When ruling on a motion for summary judgment, the Court does not resolve issues of fact and must deny the motion if there is any genuine issue of material fact. *Singleton v. Stewart*, 280 N.C. 460, 464 (1972).

19. "Ordinarily it is error for a court to hear and rule on a motion for summary judgment when discovery procedures, which might lead to the production of evidence relevant to the motion, are still pending and the party seeking discovery has not been dilatory in doing so." *Conover v. Newton*, 297 N.C. 506, 512 (1979).

### III.   ANALYSIS

20. In North Carolina, "[w]henever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution." *Lane v. Scarborough*, 284 N.C. 407, 409–10 (1973); *Galloway v. Snell*, 384 N.C. 285, 287–88 (2023) ("Written contracts are to be construed and

enforced according to their terms. They must receive a reasonable interpretation, according to the intention of the parties at the time of executing them, gathered from the language employed by them." (internal citation and quotation marks omitted)).

21. The language in a contract "should be given its natural and ordinary meaning." *Southpark Mall Ltd. P'ship v. CLT Food Mgmt., Inc.*, 142 N.C. App. 675, 678 (2001) (citation omitted). If the terms of a contract are unambiguous, then the court "cannot look beyond the terms of the contract to determine the intentions of the parties." *Stovall v. Stovall*, 205 N.C. App. 405, 410 (2010) (quoting *Lynn v. Lynn*, 202 N.C. App. 423, 431 (2010)); *see also Walton v. City of Raleigh*, 342 N.C. 879, 881 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract."); *Johnston Cnty. v. R.N. Rouse & Co., Inc.*, 331 N.C. 88, 95 (1992) ("[T]he most fundamental principle of contract construction [is] that the courts must give effect to the plain and unambiguous language of a contract.").

22. An ambiguity exists when the language of a contract is fairly and reasonably susceptible to differing interpretations. *Salvaggio v. New Breed Transfer Corp.*, 150 N.C. App. 688, 690 (2002). While not controlling, "[t]he fact that a dispute has arisen as to the parties' interpretation[s] of the contract is some indication that the language of the contract is, at best, ambiguous." *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Freeman-White Assoc., Inc.*, 322 N.C. 77, 83 (1988)).

23. Ultimately, deciding whether the language of a contract is ambiguous is a question for the court. *Lynn v. Lynn*, 202 N.C. App. 423, 432 (2010). If it is ambiguous, extrinsic evidence may be used to determine the parties' intent. *Int'l*

*Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 317 (1989) ("If the writing leaves it uncertain as to what the agreement was, parol evidence is competent, not to contradict, but to show and make certain what was the real agreement between the parties."). However, in that event, interpretation of the contract is no longer a question of law but is rather a question of fact. *See, e.g., Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273 (2008) ("When an agreement is ambiguous and the intention of the parties is unclear . . . interpretation of the contract is for the jury."); *Martin v. Ray Lackey Enters., Inc.*, 100 N.C. App. 349, 354 (1990) ("[I]ntent is a question of law [only] where the writing is free of any ambiguity which would require resort to extrinsic evidence or the consideration of disputed fact."); *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 157 (1983) ("Ambiguities in contracts are to be resolved by the [factfinder.]").

24.     In its Motion, HCA argues that the phrase "shall not discontinue" unambiguously means that it cannot completely stop one or more of the services identified in Schedule 7.13(a). It asks the Court to interpret its obligation accordingly.

25.     The Attorney General contests this interpretation and points out that the phrase in question is actually, "Buyer shall not discontinue *the provision of the services* set forth on Schedule 7.13(a)." He argues that HCA agreed to commit itself, not just to an organizational structure that includes certain service lines, but to *actually providing* all of the services contained within Schedule 7.13(a).

26. HCA relies on several dictionary definitions of the verb "discontinue" to support its position. According to the Merriam-Webster Dictionary, "discontinue" means "to break the continuity of: cease to operate, administer, use, produce, or take." (Def.'s Br. Supp. of Mot. [Def.'s Br.] 17, ECF No. 70.) HCA contends that it is providing each of the services listed and that the Attorney General is attempting to add quality and volume metrics that were not negotiated. (Def.'s Br. 14, 17–19; Def.'s Reply in Supp. Mot. Partial Summ. J. [Def.'s Reply Br.] 8, ECF No. 94.)[5]

27. HCA also points to other provisions in the APA to support its argument. Among other things, HCA contends that Section 7.13(h), which requires HCA to cause the facilities to "remain enrolled and in good standing in Medicare, Medicaid or their successor programs," as well as the changes made to add measurable requirements to the service commitments found in Schedule 7.13(b), prove that the Attorney General knew how to negotiate for these metrics but did not do so with respect to Section 7.13(a) and its schedule. (Def.'s Br. 9–10.)

28. The Attorney General agrees that to breach the APA, HCA must discontinue a service. However, he argues that HCA's interpretation is a "cramped reading" of the relevant language and that discontinuing a service means more than just shuttering an entire service line. For example, the Attorney General contends that HCA is no longer providing inpatient treatment to complex hematology cancer

---

[5] The Court declines the parties' invitation to look to extrinsic evidence to determine whether the language of Section 7.13(a) is *unambiguous*. (*See, e.g.,* Def.'s Br. 20–23.) As discussed below, extrinsic evidence only becomes relevant if the language is *ambiguous*, and then summary judgment is appropriate only if there is no genuine issue of material fact with respect to the intent of the contracting parties.

patients, a service he argues was provided at the time the APA was executed. (Pl.'s Resp. Opp. Def.'s Mot. Summ. J. [Pl.'s Br.] 2, ECF No. 93.) He maintains that HCA discontinued a service when it stopped providing otolaryngology (ear, nose and throat) surgical services "for periods lasting longer than a week, even though Level II Trauma facilities are required to provide those services around-the-clock." (Pl.'s Br. 10.)

29. Again, referencing the Merriam-Webster Dictionary definition of "discontinue," the Attorney General focuses on the phrase "to break the continuity of" and argues that even a gap or temporary break in a service constitutes a discontinuation of that service for the patient impacted. (Pl.'s Br. 18.) Using HCA's interpretation, the Attorney General argues, all that would be required to comply with Section 7.13(a) is for HCA to have provided some type of oncology service (for example, one chemotherapy treatment for breast cancer) to a single patient at some point in 2023 – an interpretation so parsimonious as to be inconceivable given the Attorney General's duty to protect the public's access to healthcare. (Pl.'s Br. 2.) And, turning HCA's argument on its head, the Attorney General contends that had the parties intended for "discontinue" to mean the total cessation of a service, they could have simply used the word "cease." (Pl.'s Br. 20–21.)

30. As for emergency and trauma services, the Attorney General points out that Schedule 7.13(a) requires the service to be "generally consistent with the current Level II Trauma Program," (that is, the Level II Trauma Program that existed at the time the transaction closed), a requirement that the Attorney General contends

necessarily incorporates quantity and quality measurements. He argues, for example, that a break in the continuity of the provision of ENT surgical services is a breach of HCA's obligation because such services were available prior to HCA's acquisition. (Pl.'s Br. 22–24.)

31. Finally, like HCA, the Attorney General argues that other provisions of the APA support his interpretation. He contends that the parties heavily negotiated Section 7.13(a)'s definition of "Contingencies" (circumstances that would allow HCA to discontinue a service, such as the unavailability of qualified physicians) to include only circumstances that occur after the first ten years. They did not include circumstances that might occur earlier because the parties always intended for HCA to "provide the services Mission Hospital previously offered (if encompassed by Schedule 7.13(a)) even if independent physician groups decline to provide the service at the Hospital or even offer a competing service nearby." (Pl.'s Br. 23–24.)

32. After reviewing the briefing and hearing from the parties at oral argument, the Court concludes not only that the words "shall not discontinue" in Section 7.13(a) are ambiguous, but also that the word "services" lacks clarity. Additional evidence is needed to determine the parties' intent. For example, does a discontinuation of chemotherapy under "oncology services" mean a cessation of *all types* of chemotherapy, or is it enough to stop providing *one type* of chemotherapy? Does it mean that the service stops for all current and prospective patients, or is it enough for a single patient to experience a discontinuation of treatment? Must the cessation be permanent, or is a temporary stop enough?

33. To be sure, the three words "shall not discontinue" cannot be interpreted in a vacuum. Basic rules of contract construction require the Court to consider the words in their context:

> A contract must be construed as a whole, and the intention of the parties is to be collected from the entire instrument and not from detached portions, it being necessary to consider all of its parts in order to determine the meaning of any particular part as well as of the whole. Individual clauses in an agreement and particular words must be considered in connection with the rest of the agreement, and all parts of the writing, and every word in it, will, if possible, be given effect.

*Robbins v. C. W. Myers Trading Post, Inc.*, 253 N.C. 474, 477 (1960) (citation and quotation marks omitted). It is noteworthy, then, that both HCA and the Attorney General argue that reading the words in context supports their differing interpretations of Section 7.13(a). Each likewise argues that the dictionary definition of "discontinue" supports its/his position. The depth of the parties' disagreement about the meaning of the language is telling.

34. The Court concludes that the relevant language of the APA is "fairly and reasonably susceptible to either of the constructions asserted by the parties." *St. Paul Fire & Marine Ins. Co.*, 322 N.C. at 83. Consequently, an ambiguity exists that prevents the Court from construing the language at this stage as a matter of law. The intent of the parties as to the meaning of the language cannot be determined without a more robust record.

35. On that point, the parties appear to agree that it is the intent of the contracting parties—and not the Attorney General —that should control here. (Pl.'s Br. 26, Def.'s Reply Br. 14.) HCA argues that it has presented evidence that the seller

and HCA agreed on the meaning of the relevant language and that it was incumbent on the Attorney General to present evidence to the contrary. (Def.'s Reply Br. 14–15.)

36. But the Attorney General takes issue with HCA's evidence. He argues that an email exchange between Mission's then-CEO Ron Paulus and HCA's counsel Chuck Hall in which Mr. Paulus wrote that it was "particularly important" that "the services available today at Mission Hospital are going to be here for at least 10 years" supports his argument rather than HCA's argument. (Def.s' Br. Ex 10, ECF 71.10.) In the Attorney General's view, Mr. Paulus's statement makes it clear that Mission Health was "only interested in a deal with HCA if HCA agreed to continue each of the existing services at Mission Hospital." (Pl.'s Br. 27–28.) More is needed to determine what Mr. Paulus actually meant.

37. In addition, the Attorney General argues that deciding the contracting parties' intent on summary judgment at this stage would be premature because discovery is ongoing. (Pl.'s Br. 29.) Although HCA challenges the assertion that any such discovery will shed light on the parties' intent, the Attorney General disagrees and has presented an affidavit to that effect. (Def.'s Reply Br. 2, 14–17; Aff. of Jessica Sutton, ECF No. 93.11.)

38. The Court observes that after a hearing on the Motion, HCA requested and was given the opportunity to depose the seller. (Order Following BCR 10.9 Conference, ECF No. 116.) In addition, the Court has only recently ruled on Defendant's Motion to Compel and has ordered that certain internal documents from the Office of the Attorney General be produced in discovery. It remains to be seen

what, if any, evidence with respect to the contracting parties' intent will surface in this discovery. However, there is no doubt that a determination of the parties' intent with respect to the contract language at issue requires a more developed record than the one presented.

### IV.  CONCLUSION

39.  As the party moving for summary judgment, HCA must establish that there are no genuine issues of material fact. Because it is unable to do so at this juncture, summary judgment is not appropriate. Accordingly, the Court **DENIES** the Motion.

**IT IS SO ORDERED**, this the 16th day of April, 2025.

/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases