IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-252

Filed 2 April 2024

Mecklenburg County, No. 22 CVS 6443

DOUG TURPIN AND NICOLE TURPIN, Plaintiffs,

v.

CHARLOTTE LATIN SCHOOLS, INC., CHARLES D. BALDECCHI, TODD
BALLABAN, DENNY S. O'LEARY, MICHAEL D. FRENO, R. MITCHELL
WICKHAM, COURTNEY HYDER, IRM R. BELLAVIA, PHIL COLACO, JOHN D.
COMLY, MARY KATHERINE DUBOSE, ADAORA A. ERUCHALU, DEBBIE S.
FRAIL, DON S. GATELY, ISRAEL K. GORELICK, JOY M. KENEFICK, KARIM
LOKAS, JOHN T. MCCOY, KRISTIN M. MIDDENDORF, A. COY MONK IV, UMA
N. O'BRIEN, DAVID A. SHUFORD, MICHELLE A. THORNHILL, FLETCHER H.
GREGORY III, TARA LEBDA, AND PAIGE FORD, Defendants.

Appeal by plaintiffs from order entered 13 October 2022 by Judge Lisa C. Bell

in Mecklenburg County Superior Court. Heard in the Court of Appeals 31 October

2023.

Ward and Smith, P.A., by Christopher S. Edwards, Alex C. Dale, and Josey L.
Newman; Vogel Law Firm PLLC, by Jonathan A. Vogel; and Dowling Defense
Group, LLC, by John J. Dowling III, for plaintiff-appellants.

Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by William A.
Robertson, Jim W. Phillips, Jr., Jennifer K. Van Zant, and Kimberly M.
Marston, for defendant-appellees.

Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Christopher
G. Smith, B. Davis Horne, Jr., David R. Ortiz, for amicus curiae North Carolina
Association of Independent Schools and the Southern Association of
Independent Schools.

Melinda R. Beres for amicus curiae Concerned Private School Parents of
Charlotte.

*Envisage Law, by James R. Lawrence III, for amicus curiae Moms for Liberty Union County, Mecklenburg County, Wake County, Iredell County, Chatham County, Forsyth County, Guilford County, Buncombe County, Stanly County, New Hanover County, Onslow County, Bladen County, and Transylvania County.*

THOMPSON, Judge.

Appeal by plaintiffs from the trial court's order granting in part and denying in part defendants' motion to dismiss the nine claims plaintiffs asserted against defendants, including fraud; unfair and deceptive trade practices; negligent misrepresentation; negligent infliction of emotional distress; negligent supervision and retention; slander; libel; breach of contract; and breach of implied covenant of good faith and fair dealing. The trial court denied defendants' motion to dismiss as to plaintiffs' ninth claim, breach of implied covenant of good faith and fair dealing, which plaintiffs subsequently voluntarily dismissed without prejudice. Upon careful review of the matters discussed below, we affirm.

## I. Factual Background and Procedural History

In April 2022, Doug and Nicole Turpin (plaintiffs) filed suit against defendants Charlotte Latin Schools, Inc. (Latin); the Head of School, Charles Baldecchi (Baldecchi); the Head of Middle School, Todd Ballaban (Ballaban); and the school's board members (Board). On 18 July 2022, defendants filed a motion to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil

Procedure. When defendants' motion came on for hearing at the 20 September 2022 session of Mecklenburg County Superior Court, the allegations taken in the light most favorable to the plaintiffs tended to show the following:

Plaintiffs' children, O.T. and L.T.[1], attended Latin (graded K-12) from the time they were in kindergarten through 10 September 2021, when defendants Baldecchi and Ballaban, during a meeting with plaintiff Doug Turpin, terminated the enrollment contract between Latin and plaintiffs.

Plaintiffs allege that up until the 2020-2021 school year, Latin provided a traditional, apolitical education. However, in June 2020, following the death of George Floyd, a letter was sent to Latin parents, faculty, and staff that plaintiffs felt indicated the school "was moving toward a curriculum, culture, and focus associated with a political agenda." That same month, parents, faculty, staff, and alumni began receiving a video series distributed by Latin entitled "Conversations About Race." On 4 July 2020, Baldecchi sent Latin parents, faculty, and staff a letter titled "My Reflections on the Fourth of July and My Journey Through Life as We Live History," wherein he recounted his participation in a high school prank that, "was not racially motivated" at the time, but "in today's lens, it is horrific."

During the 2020-2021 school year, plaintiffs and other Latin parents began to discuss their concerns about the communications they had received from the school,

---

[1] Initials are used to protect the identities of the minor children.

as well as changes in curriculum, reading materials, and classroom policies that they felt "were indicative of the adoption of a political agenda." Ultimately, the group of parents, including plaintiffs, who had begun calling themselves "Refocus Latin[,]" requested a meeting with the Board to address their concerns.[2]

In February 2021, plaintiffs entered into enrollment contracts with Latin for the 2021-2022 school year. In bold typeface, the enrollment contracts stated

> I understand that in signing this [e]nrollment [c]ontract for the coming academic year, my family and I understand the mission, values, and expectations of the School as outlined in the *Charlotte Latin School Parent-School Partnership* and agree to accept all policies, rules, and regulations of Charlotte Latin Schools, Inc., including those as stated and as referred to above.

(emphasis in original).

The enrollment contracts also state that "[i]f this [e]nrollment [c]ontract is *acceptable to you*, please 'sign' as directed below . . . . This shall constitute your signature in acceptance of this [e]nrollment [c]ontract and certifies that you have read the [c]ontract and understand it." (emphasis added). Both enrollment contracts were signed by plaintiff Nicole Turpin. The enrollment contracts acknowledge that "[t]his instrument shall be interpreted in accordance with the laws of the State of North Carolina."

---

[2] Refocus Latin stated that their mission was to "[c]onfirm the foundational principles supporting a Mission based upon the stated core values and beliefs. We must hold fast to what is true and double down on what made the school successful for five decades."

Finally, the enrollment contracts state that, "I agree to uphold the Parent-School Partnership." The Parent-School Partnership provides, in pertinent part, that a

> positive, collaborative working relationship between the School and a student's parent/guardians is essential to the fulfillment of the School's mission. Therefore, *the School reserves the right to discontinue enrollment* if it concludes that the actions of a parent/guardian make such a relationship impossible or seriously interfere with the School's mission."

(emphasis added).

Moreover, the Parent-School Partnership states that, "[t]he School will uphold and enforce rules and policies detailed in the Family Handbook in a fair, appropriate[,] and equitable manner."[3]

In July 2021, Refocus Latin was invited to present their concerns to the Executive Committee of the Board. Prior to the meeting with the Board, two Refocus Latin parents met with the Board's Chair, Denny O'Leary, to express the group's apprehension about retaliation from Latin for participating in the presentation. O'Leary assured the parents that they would not be subjected to any retaliation "for the parent[s'] exercise of the contractual right to communicate concerns to Latin" and asked the two Refocus Latin parents to communicate that message to the rest of the Refocus Latin parents, including plaintiffs.

---

[3] According to plaintiffs' complaint, the Family Handbook for the 2021-2022 school year provided that "[t]he school will continue to review and update its programs in all areas."

On 24 August 2021, ten members of Refocus Latin,[4] including plaintiff Doug Turpin, brought their PowerPoint presentation to the Executive Committee of the Board, Baldecchi, and defendant Fletcher H. Gregory III. At the meeting, members of the Board, including O'Leary, again assured the group that there would be no retaliation against any parents for bringing their concerns about Latin before the Board. When the presentation concluded, O'Leary expressed her appreciation to the parents for their presentation, but advised the parents that neither the Board nor the administration of Latin would continue the dialogue about the concerns Refocus Latin had presented, that no response to the presentation would be provided, and that any future concerns the individual parents had should be taken to Latin's administrators.

On 25 August 2021, the day after the presentation, O'Leary sent an email to the ten participants, including plaintiff Doug Turpin, thanking them again for communicating their concerns to the Board and expressing her optimism about Latin and its future. On 29 August 2021, plaintiff Doug Turpin responded to O'Leary's email, thanking the Executive Committee of the Board for its time but also expressing his disappointment in the Board's decision not to continue the dialogue with Refocus Latin.

Following Refocus Latin's presentation to the Board, parents who had participated in the preparation of the presentation and had access to the PowerPoint

---

[4] The Board restricted the number of parents who could attend the presentation to no more than ten.

emailed the PowerPoint presentation to other parents who had the same concerns as the parents of Refocus Latin. Between 1–2 September 2021, Baldecchi met with Latin faculty and staff via video calls and advised them that he was aware that the PowerPoint presentation had been obtained by other parents within the Latin community. He stated that the PowerPoint presentation was "just awful," "very hurtful," and that, "[o]ne reads it and cringes." He further stated that the parents' concerns about the curriculum and culture of Latin were a "lost cause," that Refocus Latin had met with the Board in "bad faith[,]" and that the presentation was "an attack on our community with the intention of ripping its fabric apart." Baldecchi advised faculty and staff not to engage with parents who communicated concerns with the curriculum and culture of Latin, but to "point them to me, please."

One week later, on 7 September 2021, plaintiffs emailed Ballaban with concerns they had about L.T.'s sixth-grade Humanities class. L.T. had shared with plaintiffs some of the comments made by his teacher, which plaintiffs felt were "indoctrination on progressive ideology[,]" and plaintiffs also claimed that the teacher would no longer allow L.T. to pull down "his mask for just long enough to drink water[,]" nor would she allow L.T. to go to the bathroom "when he asks to do so." Out of fear of retaliation against L.T., plaintiffs requested that Ballaban not "address this with the teacher [plaintiffs] a[re] referencing in this email" until plaintiffs had first had a chance to discuss the matter with Ballaban directly.

On 8 September 2021, Ballaban responded to plaintiffs' email and stated that

he would investigate the "serious claims" plaintiffs had made about the teacher and report back to plaintiffs in "a day or two . . . ." In response to plaintiffs' concern that the teacher might retaliate against L.T., Ballaban further assured plaintiffs that "[o]ur teachers do not retaliate and there will be no blowback, I assure you." Ballaban emailed plaintiffs later that same day, advised plaintiffs that he had looked into the matter "in depth[,]" and notified plaintiffs that he and defendant Baldecchi "would like to meet with [plaintiffs] in person about it" on 10 September 2021.

At the 10 September 2021 meeting between Baldecchi, Ballaban, and plaintiff Doug Turpin, Ballaban reported that he had spoken with L.T.'s Humanities teacher and she had denied plaintiffs' allegations regarding the class curriculum as "political indoctrination." During the meeting, Baldecchi said that the parents of Refocus Latin, and by association, plaintiffs, "believed that the school 'accepts students and hires faculty because of their color' and that students and faculty of color 'are also not up to the merit of the school.' " Thereafter, Baldecchi produced the enrollment contracts plaintiffs had signed in February 2021 and terminated the contracts. O.T. and L.T. were required to leave Latin that same day.

On 14 September 2021, an email was sent from "The Board of Trustees, Charlotte Latin School" to Latin families, faculty, and staff, wherein the Board stated that it "categorically rejects the assertion that diverse students and faculty have not earned their positions and honors at Latin and that diversity comes at the expense of excellence."

On 25 April 2022, plaintiffs filed suit against defendants, alleging fraud, unfair and deceptive trade practices, negligent misrepresentation, negligent infliction of emotional distress, negligent retention and supervision, slander, libel, breach of contract, and breach of implied covenant of good faith and fair dealing. On 18 July 2022, defendants filed a motion to dismiss plaintiffs' complaint for failure to state a claim upon which relief could be granted pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.

The matter came on for hearing at the 20 September 2022 session of Superior Court, Mecklenburg County. By order entered 12 October 2022, the court granted defendants' motion with respect to the first eight counts of plaintiffs' complaint—fraud, unfair and deceptive trade practices, negligent misrepresentation, negligent infliction of emotional distress, negligent retention and supervision, slander, libel, and breach of contract—and denied defendants' motion with respect to the ninth count of breach of implied covenant of good faith and fair dealing. On 17 October 2022, plaintiffs voluntarily dismissed the remaining count, breach of implied covenant of good faith and fair dealing, without prejudice. On 18 October 2022, plaintiffs filed timely written notice of appeal from the court's 12 October 2022 order.

## II. Analysis

Before this Court, plaintiffs allege the following issues:

> 1. Did Latin commit fraud, when despite its administrators' promise that [plaintiffs'] complaints would not generate blowback, the [plaintiff]s' children

were expelled from Latin?

2. Did Latin's administrators negligently misrepresent their purpose for requesting a meeting with the [plaintiffs], when the [plaintiffs] were otherwise unable to learn the true purpose of the meeting?

3. Was expelling the [plaintiffs'] children an unfair or deceptive practice, in violation of [N.C. Gen. Stat.] § 75-1.1, when, despite encouraging the [plaintiffs] to engage in a frank dialogue, Latin expelled the [plaintiff]s' children as a result of their views?

4. Did Latin negligently inflict severe emotional distress on [plaintiff Nicole Turpin], when it expelled her children in the middle of a pandemic, removing them from the only school they'd ever known and their friends?

5. Did Latin negligently supervise or retain . . . [Baldecchi], when, following repeated attacks on the [plaintiffs], Baldecchi expelled their children?

6. Did Latin defame the [plaintiffs] when it accused a small, identifiable group of parents, which included the [plaintiffs], of harboring racist views?

7. Did Latin breach its enrollment contracts with the [plaintiffs], when those contracts allowed Latin to terminate its relationship with the [plaintiffs] only if [plaintiffs] made the relationship "impossible"?

We will address each of these alleged issues, not necessarily in this order, in the analysis to follow.

**A.  Standard of review**

"The standard of review for an order granting a Rule 12(b)(6) motion to dismiss

is well established[;] [a]ppellate courts review de novo an order granting a Rule 12(b)(6) motion to dismiss." *Taylor v. Bank of Am., N.A.*, 382 N.C. 677, 679, 878 S.E.2d 798, 800 (2022). "The appellate court, just like the trial court below, considers whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Id.* (citation and internal quotation marks omitted).

## B.    Breach of contract

On appeal, plaintiffs contend that they "sufficiently alleged a breach of contract, and the trial court was wrong to conclude otherwise" because "the court ignored the agreement's plain language and disregarded Latin's obligation to apply those agreements in good faith." We disagree, because the plain and unambiguous language of the enrollment contracts—and pursuant to the enrollment contracts, the Parent-School Partnership—allowed Latin to terminate plaintiffs' enrollment contracts at Latin's discretion.

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015) (citation omitted). "The most fundamental principle of contract construction—is that the courts must give effect to the plain and unambiguous language of a contract." *Am. Nat'l Elec. Corp. v. Poythress Commer. Contractors, Inc.*, 167 N.C. App. 97, 100, 604 S.E.2d 315, 317 (2004) (citation and brackets omitted). "Whether or not the language of a contract is

- 11 -

ambiguous . . . is a question for the court to determine." *Lynn v. Lynn*, 202 N.C. App. 423, 432, 689 S.E.2d 198, 205 (citation omitted), *disc. review denied*, 364 N.C. 613, 705 S.E.2d 736 (2010). "In making this determination, words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible . . . ." *Id.* (citation and internal quotation marks omitted). However, "North Carolina courts recognize that freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, *must be enforced as written*." *Ricky Spoon Builders, Inc. v. EmGee LLC*, 286 N.C. App. 684, 691, 882 S.E.2d 110, 115 (2022) (citation, internal quotation marks, and brackets omitted), *disc. review denied*, __N.C.__, 891 S.E.2d 300 (2023) (emphasis added).

As discussed above, in the present case, the enrollment contracts provide that

> in signing this [e]nrollment [c]ontract . . . I understand the mission, values, and expectations of the School as outlined in the *Charlotte Latin School Parent-School Partnership* and agree to accept all policies, rules, and regulations of Charlotte Latin Schools, Inc., including those as stated and as referred to above.

(emphasis in original). The enrollment contracts go on to state that "[a]s the parent or legal guardian . . . I agree to uphold the Parent-School Partnership" which provides that a

> positive, collaborative working relationship between the School and a student's parent/guardians is essential to the fulfillment of the School's mission. Therefore, *the School reserves the right to discontinue enrollment* if it concludes that the actions of a parent/guardian make such a

relationship impossible or seriously interfere with the
School's mission.

(emphasis added).

Therefore, giving the words of the contract, "the School reserves the right to discontinue enrollment[,]" their "usual and ordinary meaning[,]" *Lynn*, 202 N.C. App. at 432, 689 S.E.2d at 205, whether Latin breached their contracts with plaintiffs by discontinuing enrollment turns on whether *Latin* "conclude[d] that the actions of [plaintiffs]" made a "positive, collaborative working relationship between the School" and plaintiffs "impossible[,]" or "seriously interfere[d] with the School's mission."

**a. Impossibility of positive, collaborative working relationship**

On appeal, plaintiffs contend that "[t]he trial court erred when it dismissed [plaintiff]s' breach of contract claim because plaintiffs "did not make the required 'positive, collaborative working relationship' between themselves and Latin 'impossible.'" We disagree, because the plain language of the contract confers *Latin*, not plaintiffs, with the discretion to determine when such a relationship is impossible.

In their appellate brief, plaintiffs define "impossible" to mean "incapable of having existence or of occurring" or "not capable of being accomplished." (brackets omitted). Our Court has defined "[i]mpossible" as "not possible; that cannot be done, occur, or exist . . . ." *Morris v. E.A. Morris Charitable Found.*, 161 N.C. App. 673, 676, 589 S.E.2d 414, 416 (2003) (citation omitted), *disc. review denied*, 358 N.C. 235, 593 S.E.2d 592 (2004). However, we need not enter into such an unwieldy inquiry as to

determine when a "positive, collaborative working relationship" between the parties became "impossible[,]" because the plain language of the contract establishes that *Latin* "reserved the right" to make such a determination. Again, "North Carolina courts recognize that freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, *must be enforced as written.*" *Ricky Spoon,* 286 N.C. App. at 691, 882 S.E.2d at 115 (citation, internal quotation marks, and brackets omitted) (emphasis added).

Here, the plain language of the contract establishes that Latin "reserved the right" to discontinue enrollment "if [Latin] conclude[d] that the actions of a parent/guardian ma[de] [a positive, collaborative working] relationship impossible or seriously interfere[d] with the School's mission." "[G]iv[ing] effect to the plain and unambiguous language of [the] contract[,]" *Am. Nat'l Elec. Corp.,* 167 N.C. App. at 100, 604 S.E.2d at 317 (citation omitted), a determination of whether a positive, collaborative working relationship with plaintiffs was impossible was left to the discretion of Latin—not to plaintiffs, not to this Court—but to *Latin*.

Moreover, as the amicus brief filed by the North Carolina Association of Independent Schools and the Southern Association of Independent Schools, a representative of "almost [ninety] independent schools across the State[,]" acknowledges, "[t]he private right of associations allows independent schools to define their values, mission[,] and culture as they see fit. Some schools may be conservative, others liberal, more in the middle."

We agree with amicus curiae; private schools provide alternatives to public education for parents who, for one reason or another, desire for their children to be educated outside of the public school system. Private schools' independence allows them to define their values, missions, and cultures as they deem necessary. It allows private sectarian schools to engage in daily prayer and to teach classes on biblical issues. It also allows private military schools to prepare our youth for careers of service to our Nation's Armed Forces. This autonomy—to define their values, missions, and cultures—extends to private schools of all ideologies, religions, and perspectives, even those associated with "political agendas." Again, this is a benefit of private schools—indeed, the predominate *purpose* of private schools—not a detriment.

If this suit were allowed to proceed, speech at private schools would be chilled; there would be fewer educational opportunities for students—and fewer alternatives for parents. Private schools would avoid controversial subjects, such as the teaching of Creationism, simply to avoid protracted litigation such as the litigation in the instant case. After stripping away all of the heated arguments surrounding the school's curriculum, the dispositive issue in this case is straightforward; this is a simple matter of contract interpretation.

Plaintiffs renewed their enrollment contracts each school year, including the 2021-2022 school year, despite Latin indicating that, in plaintiffs' words, the school "was moving toward a curriculum, culture, and focus associated with a political

agenda" beginning in June of 2020. For nearly a year prior to the termination of their enrollment contracts, plaintiffs made it clear that their worldview did not conform with that of Latin, and they were aware of this when they re-enrolled their children at Latin for the 2021-2022 school year in February 2021. As the aforementioned amicus brief notes, "the remedy if [plaintiffs] wish to associate with others [of their political views and preferences[5]] is to vote with their feet" and enroll their children in a different private school, one which more accurately reflects their worldview.

Today's dissent would undermine the aforementioned private right of associations, while simultaneously upending the "constitutionally guaranteed" freedom of contract. We note that absent from today's dissent is the plain language of the dispositive provision of the contract which, again, provides that, "*the School reserves the right* to discontinue enrollment *if it concludes* that the actions of a parent/guardian make such a relationship impossible or seriously interfere with the School's mission." (emphases added).

While the dissent is correct to acknowledge that "[a] complaint should not be dismissed under Rule 12(b)(6) unless it affirmatively appears that [the] plaintiff is entitled to no relief under any state of facts which could be presented in support of their claim[,]" it simply ignores that the allegations of the complaint, treated as true, in the light most favorable to the non-moving party, affirmatively established that

---

[5] This phrase appears on page ten of the amicus curiae brief filed by the North Carolina Association of Independent Schools and the Southern Association of Independent Schools.

plaintiffs are not entitled to relief under any state of facts. The plain language of the contract necessarily defeated plaintiffs' claim for breach of contract.

For this reason, the trial court was correct in dismissing plaintiffs' claim for breach of contract pursuant to "the plain and unambiguous language of [the] contract." *Id.* (citation omitted).

**b. Seriously interfere with the school's mission**

Alternatively, in their appellate brief, plaintiffs assert that "[n]othing in the complaint would allow this Court to infer that . . . [plaintiffs] violated [Latin's] mission." We disagree because, again, the plain language of the contract provided that Latin—not plaintiff, not this Court—reserved the right to make such a determination.

Again, "North Carolina courts recognize that freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, must be enforced as written." *Ricky Spoon,* 286 N.C. App. at 691, 882 S.E.2d at 115 (citation, internal quotation marks, and brackets omitted). As discussed at length above, whether "the actions of" plaintiffs "seriously interfere[d] with the School's mission"[6] was left to the discretion of Latin, and for the aforementioned reasons, the trial court did not err when it dismissed plaintiffs' claim

---

[6] In their complaint, plaintiffs allege that Latin's mission is "to encourage individual development and civility in our students by inspiring them to learn, by encouraging them to serve others, and by offering them many growth-promoting opportunities."

for breach of contract.

**C.    Fraud**

Alternatively, plaintiffs argue that the trial court "erred when it dismissed [plaintiff]s' fraud . . . claim[]" because "[r]eading the complaint most favorably to [plaintiffs], they have alleged both a false statement and a misleading omission." Again, we disagree.

In their complaint, plaintiffs alleged "fraud in connection with Ballaban's false representations on [8 September] 2021" that (1) "Latin would not retaliate against [plaintiffs'] children for expressing their concerns" and (2) "that a proposed [10 September] 2021 in-person meeting . . . would *solely* be an opportunity for Baldecchi and Ballaban – consistent with the Parent-School Partnership – to answer and/or address [plaintiffs'] concerns, as those concerns were set forth in [plaintiff Doug Turpin]'s [7 September] 2021 email to Ballaban." (emphasis added) We will address both of these allegedly false representations in turn.

**a. False representations**

In order to bring a claim for fraud, a plaintiff must establish a "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007). "Additionally, any reliance on the allegedly false representations must be reasonable." *Id.* at 527, 649 S.E.2d at 387. "Reliance is not reasonable where the

plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26, 581 S.E.2d 452, 458, *disc. review denied*, 357 N.C. 511, 588 S.E.2d 473 (2003).

**i. False representation re: retaliation**

In their complaint, plaintiffs claimed that "Ballaban made false representations in his [8 September] 2021 emails that Latin would not retaliate – when he stated, 'there will be no blowback, I assure you' – against [plaintiffs'] children for expressing their concerns." In their appellate brief, plaintiffs claim that "[b]y promising [plaintiff Doug Turpin] that L.T. would face no blowback, only to expel him, Ballaban—and, through Ballaban, Latin—made a false statement." However, this reasoning is a misapprehension of cause and effect.

When considering plaintiffs' claim for fraud, the trial court explicitly noted that, "I've read the Complaint, and I . . . interpret expulsion to be referring to discipline for the children. And there's absolutely nothing in the Complaint that alleges any behavior on the part of the children that resulted in the termination of the enrollment agreement." The court observed that "[i]t was . . . alleged to be [plaintiff]s' behavior that resulted in the termination of th[e] enrollment agreement."

As the trial court suggested, there was no "blowback" from the teacher towards plaintiffs' child, L.T., as a result of plaintiffs' expression of concern about the school's culture and curriculum. L.T.'s removal from the school was an *ancillary effect* of the termination of the enrollment contract *between plaintiffs and defendants*, not a

retaliatory action taken against L.T. by his teacher. Indeed, our independent review of the record reveals that the "blowback" contemplated by plaintiffs and Ballaban in the 8 September 2021 email specifically related to blowback from "the teacher [plaintiffs] a[re] referencing in this email[,]" not from Ballaban or Baldecchi.

For this reason, the trial court was correct to conclude that Ballaban did not make a false representation when he stated that "[o]ur teachers do not retaliate and there will be no blowback, I assure you."

**ii. False representation re: purpose of 10 September meeting**

Moreover, our careful review of the record makes clear that defendants made no representation that the nature and purpose of the 10 September 2021 meeting was *solely* an opportunity to address plaintiffs' concerns. The email from Ballaban on 8 September 2021 states in its entirety: "I have had a chance to review your email and look into the matter in depth. Chuck Baldecchi and I would like to meet with [plaintiffs] in person about it. I have copied [Baldecchi] and his assistant Michelle Godfrey, who can assist in finding us some time. Thank you."

Despite plaintiffs' assertion in their complaint that the 10 September 2021 meeting would "*solely* be an opportunity for Baldecchi and Ballaban consistent with the Parent-School Partnership – to answer and/or address [plaintiffs'] concerns," (emphasis added) no such representation was made in the 8 September 2021 email from Ballaban. While the 10 September meeting was scheduled as a result of plaintiffs' unrelenting objections to Latin's culture and curriculum, it was not the *sole*

purpose of the meeting, nor did Ballaban ever make any representation that it was. For the aforementioned reasons, we conclude that plaintiffs have failed to plead a false representation as is necessary to bring a claim for fraud.

### b. Concealment of material fact

Next, plaintiffs argue in their appellate brief that "Ballaban and Baldecchi's silence [was] misleading" and that they "had to accurately inform [plaintiff Doug Turpin] about the meeting's purpose" because they "owed [plaintiff Doug Turpin] a duty to speak." We disagree, because Baldecchi and Ballaban did not owe plaintiffs a duty to disclose.

"A duty to disclose arises in three situations. The first instance is where a fiduciary relationship exists between the parties to the transaction." *Harton v. Harton*, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119, *disc. review denied*, 317 N.C. 703, 347 S.E.2d 41 (1986). The next two situations where a duty to disclose arises exist outside of a fiduciary relationship (1) "when a party has taken affirmative steps to conceal material facts from the other[,]" or (2) "where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Id.* at 298, 344 S.E.2d at 119.

Plaintiffs contend that Ballaban "had a duty to speak because he made the misleading statement, telling [plaintiff Doug Turpin] that he and Baldecchi 'would like to meet . . . in person about' [plaintiffs'] concerns." However, Ballaban did not

make a misleading statement; Ballaban never stated that the meeting was to address plaintiffs' "concerns[,]" nor, as discussed above, that the 10 September 2021 meeting was "*solely*" to address plaintiffs' concerns. (emphasis added).

What Ballaban did state, as noted above, was that, "I have had a chance to review your email and look into the matter in depth. Chuck Baldecchi and I would like to meet with [plaintiffs] in person about it." Absent from the email correspondence between plaintiff Doug Turpin and Ballaban is any hypothetical itinerary or "purpose" for the meeting.

Ballaban had no duty to disclose the purpose of the 10 September meeting because there was not "a fiduciary relationship . . . between the parties to the transaction[,]" he did not take "affirmative steps to conceal material facts" about the purpose of the meeting, nor was there any allegation of a "latent defect in the subject matter of the negotiations . . . ." *Id.* at 297–98, 344 S.E.2d at 119. For the aforementioned reasons, plaintiffs have failed to allege a false representation or concealment of a material fact as is necessary to bring a claim for fraud. The trial court was correct in dismissing plaintiffs' claim for fraud pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.

**D. Negligent misrepresentation**

Plaintiffs also argue that they "have alleged a viable negligent misrepresentation claim against Ballaban" because he "falsely assured [plaintiffs] that L.T. would face 'no blowback' for [plaintiffs'] complaints[,]" plaintiffs "relied on

that statement[,]" and "Ballaban owed [plaintiffs] a duty of care." Again, we disagree.

"The tort of negligent misrepresentation occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care." *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532, 537 S.E.2d 237, 240 (2000) (citation and brackets omitted), *disc. review denied*, 353 N.C. 381, 547 S.E.2d 18 (2001).

Our Supreme Court has defined a breach of the duty of care, the fourth element of a negligent misrepresentation claim as, "[o]ne who, *in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest*, supplies false information for the guidance of others in their business transactions," and is therefore "subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Id.* at 534, 537 S.E.2d at 241 (emphasis in original).

Despite plaintiffs' assertion that "Latin and Ballaban owed [plaintiffs] a duty of care[,]" because Ballaban "held all the cards," in that he "ha[d] or control[led] the information at issue[,]" plaintiffs' argument is based on an incorrect characterization of our Court's analysis in *Rountree v. Chowan County*. In that case, our Court recognized that a duty of care giving rise to a claim for negligent misrepresentation "commonly arises within *professional relationships*." *See Rountree*, 252 N.C. App. 155, 160, 796 S.E.2d 827, 831 (2017) (emphasis added) (recognizing the duty of care has

also been extended to real estate appraisers, engineers, and architects).

We went on to note that North Carolina courts "have also recognized, albeit in a more limited context, that a separate duty of care may arise between adversaries in a *commercial* transaction[,]" where "the seller owed a duty to the buyer during the course of negotiations 'to provide accurate, or at least negligence-free financial information' about the company" because the seller "was the only party who had or controlled the information at issue" and the buyer "had no ability to perform any independent investigation." *Id.* at 161, 796 S.E.2d at 832 (citation, internal quotation marks, and emphasis omitted) (emphasis added).

As our Court recognized in *Rountree*, the duty of care giving rise to a claim for negligent misrepresentation "commonly arises within *professional relationships*[,]" and "in a more limited context . . . between adversaries in a *commercial* transaction." *Id.* at 160–61, 796 S.E.2d at 831–32 (emphases added). Neither of these circumstances are present here.

Despite plaintiffs' assertion that Ballaban owed plaintiffs a duty of care because he "held all the cards" regarding "the relevant information" and plaintiffs "had no way to verify th[e no blowback] statement's accuracy[,]" we decline to extend our State's case law regarding the duty of care that gives rise to a claim for negligent misrepresentation to a *non-professional*, *non-commercial* dispute. For this reason, the trial court did not err in dismissing plaintiffs' claim for negligent misrepresentation.

E.     **Unfair or deceptive trade practices**

Plaintiffs also assert on appeal that the trial court erred when it dismissed their UDTPA claim because defendants' conduct was "deceptive" or in the alternative, that their conduct was "unfair." We disagree.

"In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." *Id.* "The determination as to whether an act is unfair or deceptive is a question of law for the court." *Id.*

### a. Fraudulent conduct

At the outset, we note that plaintiffs' first ground for their UDTPA claim in the complaint is based upon their allegations of fraud. In fact, the allegations made pursuant to plaintiffs' UDTPA claim mirror the allegations made pursuant to their claim of fraud. "[A] plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred." *Bhatti v. Buckland*, 328 N.C. 240, 243, 400 S.E.2d 440, 442 (1991). "Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts." *Id.* (citation omitted). However, as discussed above, defendants did not commit a fraud upon plaintiffs through any "false representations" or "concealment of material fact[s]," *Forbis*, 361 N.C. at 526–27, 649 S.E.2d at 387, and for this reason, their UDTPA claim on the ground of fraud fails.

**b. Deceptive conduct**

Next, plaintiffs contend that "[e]ven if Latin's conduct w[as] not fraudulent, it was still deceptive." In their complaint, plaintiffs alleged that defendants "engaged in . . . deceptive acts or practices" by the "immoral, unethical, oppressive, and unscrupulous acts of providing repeated, express assurances from Board members that there would be no retaliation against [plaintiffs] for their participation in the presentation to the Board" which "had the tendency to deceive, and did deceive, [plaintiffs] into preparing the PowerPoint document and presenting to the Board."

However, raising concerns about the school's curriculum and culture and participating in the 24 August 2021 presentation were not the reasons for defendants' termination of plaintiffs' enrollment contracts. Indeed, there have been no allegations that any of the other parents who raised concerns about Latin's curriculum and culture or participated in the PowerPoint presentation, standing alone, were subject to "retaliation" by Latin. This discrepancy in outcomes lays bare the conclusion that it was plaintiffs *continuing* to raise concerns about Latin's curriculum and culture that led to the termination of their enrollment contracts.

Despite plaintiffs' contention on appeal that they "had received no fewer than three assurances that their complaints would not lead to retaliation[,]" the Board made no such assurance about their complaints. In reality, according to plaintiffs' own complaint, what members of the Board assured the parents associated with Refocus Latin was that "no parent who raises concerns about Latin's curriculum and

culture will be subjected to retaliation[,]" that "any parent who participates in the presentation would be even more protected from being subjected to retaliation[,]" and that "Latin would not retaliate against any of the parents for raising concerns about Latin's curriculum and culture."

What was not promised by the Board was that Latin would allow a subset of the Refocus Latin parents to *continuously raise* the same *previously raised* concerns about the curriculum and culture of the school in perpetuity. The Board assured the parents that there would be no retaliation against them for *participating in the presentation* or *raising concerns about Latin's curriculum or culture*. Plaintiffs were given an opportunity to raise their concerns about Latin's curriculum and culture, and by their own complaint, acknowledge that plaintiff Doug Turpin participated in the presentation to the Board, as he "gave the presentation in a professional and civil manner . . . ."

For this reason, plaintiffs cannot demonstrate that Latin acted deceptively, nor did its promises have the tendency to deceive, when Latin assured plaintiffs that they would not be subject to retaliation for raising concerns about the school's culture and curriculum or participating in the PowerPoint presentation.

**c. Unfair conduct**

Next, plaintiffs claim in their appellate brief that "[e]ven if Latin's conduct w[as] neither fraudulent nor deceptive, it was unfair[,]" in that "[t]he way Latin, Baldecchi, and Ballaban expelled the [plaintiff]s' children satisfies the definition of

unfairness." We disagree.

Our Supreme Court has established that in the context of a claim for UDTPA, a "practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

In the present case, we conclude that defendants did not engage in unfair conduct by instructing the Refocus Latin parents to bring any *future concerns* to the school's administrators. This is not what plaintiffs did in their 7 September 2021 email to Ballaban, wherein they raised *the same concerns* addressed in Refocus Latin's PowerPoint presentation from a few weeks earlier. In their 7 September email, plaintiffs raised concerns about "a very left wing progressive viewpoint that we think i[s] improper for a teacher to be espousing to children[,]" that plaintiffs were "looking for the traditional classical education we were promised, not an indoctrination on progressive ideology[,]" and "that is not what we believe should be taught at Latin and not what we signed up for."

The concerns raised in the 7 September 2021 email from plaintiffs to Ballaban were not new concerns, they were *the same concerns* that the Refocus Latin parents had previously expressed, and defendants' termination of plaintiffs' enrollment contracts did not "offend[] established public policy" nor was the practice "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" as is

necessary to establish an unfair act giving rise to a claim for unfair and deceptive trade practices. *Id.* For these reasons, we affirm the trial court's dismissal of plaintiffs' claim for unfair and deceptive trade practices.

## F. Negligent infliction of emotional distress

Plaintiffs also allege that the trial court "prematurely judged [plaintiff]s' NIED claim" because Baldecchi "should have known that [plaintiff Nicole Turpin] could suffer severe emotional distress based on his decision to expel her children" or that he "should have known that his conduct would cause [plaintiff Nicole Turpin] severe mental anguish even though she did not attend the [10 September] meeting . . . ." They further contend that "the unintended effects from intentional acts may negligently cause harm." We disagree.

To bring a claim for negligent infliction of emotional distress, a plaintiff must allege that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . ., and (3) the conduct did in fact cause the plaintiff severe emotional distress." *McAllister v. Ha*, 347 N.C. 638, 645, 496 S.E.2d 577, 582–83 (1998) (citation omitted). However, "[a]llegations of intentional conduct . . . even when construed liberally on a motion to dismiss, cannot satisfy the negligence element of an NIED claim." *Horne v. Cumberland Cnty. Hosp. Sys., Inc.*, 228 N.C. App. 142, 149, 746 S.E.2d 13, 19 (2013).

In their complaint, plaintiffs claimed that "Baldecchi's failure to follow a duty to use ordinary care to protect [plaintiff Nicole Turpin] from injury or damage was a

proximate cause of [plaintiff Nicole Turpin]'s severe emotional distress." On appeal, plaintiffs argue that "[w]hile Baldecchi may have intended to expel O.T. and L.T., [plaintiff]s' NIED claim focuses on the negligent effects of Baldecchi's conduct[,]" and "other courts have recognized the unintended effects from intentional acts may negligently cause harm." However, this argument is unavailing, and plaintiffs cite to non-binding authority from Kansas to support their proposition that "the unintended effects from intentional acts may negligently cause harm."

In this jurisdiction, the relevant inquiry when evaluating an NIED claim is not whether the actions of the defendant led to *negligent effects*, the relevant inquiry is whether the defendant engaged in *negligent conduct*, and "[a]llegations of intentional conduct, such as these, even when construed liberally on a motion to dismiss, cannot satisfy the negligence element of an NIED claim." *Id.* Baldecchi did not *negligently* terminate the enrollment contracts, he did so intentionally. For this reason, the trial court did not err in dismissing plaintiffs' claim for negligent infliction of emotional distress.

**G.    Defamation**

Next, plaintiffs argue that "the trial court should not have dismissed [plaintiff]s' defamation claims" because "Baldecchi and the Board falsely claimed that the Refocus Latin parents had made racist accusations about faculty and students." We disagree, because Baldecchi and the Board's characterizations of the PowerPoint presentation and its contents were not materially false.

"In order to recover for defamation, a plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation." *Tyson v. L'Eggs Prods. Inc.*, 84 N.C. App. 1, 10–11, 351 S.E.2d 834, 840 (1987). "If a statement is substantially true it is not materially false." *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 68, 846 S.E.2d 647, 677 (2020). "It is not required that the statement was literally true in every respect." *Id.* "Slight inaccuracies of expression are immaterial provided that the statement was substantially true[,]" meaning that the "gist or sting of the statement must be true even if minor details are not." *Id.*

"The gist of a statement is the main point or heart of the matter in question." *Id.* "The sting of a statement is the hurtful effect or the element of the statement that wounds, pains, or irritates." *Id.* (emphasis omitted). "The gist or sting of a statement is true if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Id.* at 68–69, 846 S.E.2d at 677. (emphasis omitted).

Here, the first statement that plaintiffs contend was defamatory comes from the 10 September 2021 meeting between plaintiff Doug Turpin, Baldecchi, and Ballaban, wherein Baldecchi made a "known false statement" to plaintiff Doug Turpin, when he characterized the PowerPoint presentation by the Refocus Latin parents. Plaintiffs contend that Baldecchi's characterization of the PowerPoint presentation, that "the school accepts students and hires faculty because of their

color" and that "those students and faculty of color" were "not up to the merit of the school[,]" "was false, and Baldecchi knew it was false when he uttered the statement because he had a copy of the PowerPoint document . . . ."

Alternatively, plaintiffs contend that a 14 September 2021 email from the Board to Latin families, faculty, and staff, wherein the Board stated that it "categorically rejects the assertion that diverse students and faculty have not earned their positions and honors at Latin and that diversity comes at the expense of excellence[,]" was "false, and the Board Defendants knew it was false when they published the statement because . . . they each had a copy of the PowerPoint document . . . ."

On appeal, plaintiffs contend that "[b]oth statements mischaracterize Refocus Latin's views on Latin's culture and curriculum and falsely accuse Refocus Latin— and with it, [plaintiffs]—of harboring negative views about Latin's *current* faculty and student body." In order to determine whether Baldecchi's and the Board's characterizations of Refocus Latin's position in the PowerPoint was "materially false" so as to give rise to a claim for defamation, *id.*, 375 N.C. at 68, 846 S.E.2d at 677, we must consider the assertions made in the 24 August 2021 PowerPoint presentation to the Board and whether the statements of Baldecchi and the Board capture the "gist or sting" of the PowerPoint presentation. *Id.*

In the PowerPoint presentation, Refocus Latin asserted their "[r]eal [c]oncerns" were that "[t]he weighting of DEI and Critical Theory on a 'culturally

responsive education' eventually erodes the quality of student, quality of curriculum, quality of teacher and the academic rigor at the school[,]" and one reason "why [they] have [this concern]" is because "[a]dmissions is weighting diversity over academic excellence, particularly in [the] [Upper School]." Moreover, the PowerPoint expressed concerns that Latin was "moving away from education[al] meritocracy in line with progressive concepts of restorative justice and equity[,]" and that "DEI goals [were] superseding optimizing evaluations for admitting most qualified students and hiring most qualified faculty."

We need not exhaustively chronicle the claims made in the PowerPoint presentation, as the aforementioned statements from the PowerPoint presentation are sufficient to demonstrate that neither Baldecchi's statements to plaintiff Doug Turpin in the 10 September 2021 meeting, nor the contents of the 14 September 2021 email from the Board to the parents, faculty, and staff were "materially false[,]" as they accurately characterize the "gist or sting" of the Refocus Latin PowerPoint presentation. *Id.* As defendants succinctly note, defendants' "statements rejected a premise that Refocus Latin explicitly asserted in its PowerPoint — that Latin was compromising with respect to the academic excellence of its faculty and students by promoting DEI."

For this reason, we conclude that defendants did not make a false statement when characterizing the assertions of the Refocus Latin PowerPoint presentation, and the court did not err in dismissing plaintiffs' claims for defamation.

## H.     Negligent retention or supervision

Finally, plaintiffs contend that "the trial court should have denied [defendants'] motion to dismiss the [plaintiff]s' negligent supervision claim" because Baldecchi "committed fraud[,]" "violated the UDTPA[,]" and "defamed the [plaintiffs]. Each of these claims satisfies the negligent supervision's first element."

To bring a claim for negligent retention or supervision, a plaintiff must prove

> (1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in "oversight and supervision," . . . ; and (4) that the injury complained of resulted from the incompetency proved.

*Medlin v. Bass*, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) (citation and emphasis omitted). "[I]ncompetency, is not confined to a lack of physical capacity or natural mental gifts or of technical training when such training is required, but it extends to any kind of unfitness which renders the employment or retention of the servant dangerous to his fellow-servant . . . ." *Walters v. Durham Lumber Co.*, 163 N.C. 536, 542, 80 S.E. 49, 52 (1913) (citation and internal quotation marks omitted).

As discussed at length in the analysis above, plaintiffs' contentions that Baldecchi "violated the UDTPA[,]" that he "defamed [plaintiffs][,]" and that "he committed fraud" are incorrect. Baldecchi did not commit fraud, violate the UDTPA, or defame plaintiffs and, therefore, plaintiffs have failed to establish the "specific

negligent act on which the action is founded." *Medlin*, 327 N.C. at 591, 398 S.E.2d at 462 (citation omitted).

Moreover, plaintiffs argue that "their complaint alleges incompetency" because "Baldecchi expressed animus toward Refocus Latin and its goals and objectives" and in doing so "expressed hostility toward the Refocus Latin parents, including the [plaintiffs]." They contend that this "hostility should be sufficient to support the inference that he was incompetent." However, plaintiffs cite to no authority to support their proposition that "animus" or "hostility" necessarily entails incompetency.

Our courts have recognized incompetency where employment or retention of employment is *dangerous* to others, by previous specific acts of careless or negligent conduct, or by inherent unfitness; *Walters*, 163 N.C. at 541–42, 80 S.E. at 51–52, allegations of "animus" or "hostility" alone are insufficient to prove negligence by the employee, inherent unfitness, or that retention of the employee is dangerous to others.

Consequently, plaintiffs have failed to allege the necessary elements to bring a claim for negligent retention or supervision, that Baldecchi committed a "negligent act on which the action is founded[,]" or "incompetency" on his behalf. *Medlin*, 327 N.C. at 591, 398 S.E.2d at 462 (citation omitted). For this reason, the trial court did not err in dismissing plaintiffs' negligent retention or supervision claim.

### III. Conclusion

For the foregoing reasons, we conclude that the trial court did not err in dismissing plaintiffs' claims for breach of contract, fraud, negligent misrepresentation, unfair and deceptive trade practices, negligent infliction of emotional distress, defamation, or negligent retention or supervision pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. The order of the trial court is affirmed.

AFFIRMED.

Judge ARROWOOD concurs by separate opinion.

Judge FLOOD dissents by separate opinion.

ARROWOOD, Judge, concurring.

I concur with the majority opinion. I agree that plaintiffs failed to sufficiently allege a breach of contract because the plain and unambiguous language in the enrollment contracts, which state that "the School reserves the right to discontinue enrollment if it concludes that the actions of a parent/guardian make such a relationship impossible or seriously interfere with the School's mission[,]" allowed the school to terminate plaintiffs' 2021 enrollment contracts at its discretion. Because I believe that allowing this case, in its current state, to advance further would severely undermine the fundamental right to freely contract in North Carolina, which is a bedrock principle of North Carolina law, I write separately to highlight those concerns.

With respect to contractual agreements, North Carolina "recognizes that, unless contrary to public policy or prohibited by statute, freedom of contract is a fundamental constitutional right." *Hlasnick v. Federated Mut. Ins. Co.*, 353 N.C. 240, 243 (2000). Thus, absent such policies or prohibitive statutes, it is beyond question that parties can contract as they see fit and that courts must enforce those contracts *as written* to preserve that fundamental right. *See Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228 (1985); *see also Am. Tours, Inc. v. Liberty Mut. Ins. Co.*, 315 N.C. 341, 350 (1986) ("Freedom of contract . . . is a fundamental right included in our constitutional guarantees." (citations omitted)). In my view, these enrollment

contracts between a private school and those who wish to attend that school do not violate any public policy, statutory prohibitions, or protections.

Therefore, this is a case of basic contract interpretation. Plaintiffs entered into two enrollment contracts with the school for the 2021–2022 school year, one for each of plaintiffs' children. Those contracts—in plain and simple language—expressly *reserved the school the right to discontinue enrollment* if it concluded plaintiffs (1) made the working relationship between them and the school impossible or (2) seriously interfered with the school's mission. Thus, as the majority opinion explains, the school's determination of whether either condition occurred was left to the sole discretion of the school—not plaintiffs and not this Court. Accordingly, the trial court was correct in dismissing plaintiffs' claim for breach of contract.

I also echo the majority opinion in that recognizing plaintiffs' claims as legally sound under Rule 12(b)(6) would threaten longstanding precedents regarding the fundamental right of private parties to contract freely. Specifically, I believe such recognition would embolden parents who disagree with their children's private schools on divisive social issues to file lawsuits that would otherwise be deemed meritless and disposed of via our basic contract principles. For example, parents opposed to the faith-based curriculum of a private Christian school could enroll their child with the intent to challenge the school's religious practices. Assuming the school took steps to defend its faith-based mission by discontinuing their enrollment, as in the present case, the parents could file a complaint that applied plaintiffs' legal

theories as the footing for the suit. Consequently, such litigation would undercut fundamental contract freedoms relied upon by our State's approximately ninety (90) private schools—both secular and religious.

The dissent contends that plaintiffs' complaint sufficiently alleged breach of contract in part because the school violated the agreement to "uphold and enforce rules and policies . . . in a fair, appropriate and equitable manner." This contention is perhaps legally sensible under the claim for breach of implied covenant of good faith and fair dealing; however, I note that the trial court denied the defendants' motion on those grounds, but the plaintiffs voluntarily dismissed that claim on 17 October 2022 to pursue this appeal. Thus, under the present posture of this appeal, this theory cannot save plaintiffs from this result.

No. COA23-252 – *Turpin v. Charlotte Latin Schools, Inc.*

FLOOD, Judge, dissenting.

The line between the right to terminate a private contract and a contract breach is sometimes mercurial. While the majority would draw that line at the point at which Plaintiffs were accused of certain behaviors in violation of provisions of their private school enrollment contracts, I conclude that the mandates of a Rule 12(b)(6) review are such that we must decline to draw that line prematurely. I respectfully dissent.

When reviewing a Rule 12(b)(6) motion to dismiss, "this Court affirms or reverses the disposition of the trial court—the granting of the Rule 12(b)(6) motion to dismiss—based on [our] review of whether the allegations of the complaint are sufficient to state a claim." *Thomas v. Village of Bald Head Island*, __ N.C. App. __, __, 892 S.E.2d 888, 891 (2023) (citation and internal quotation marks omitted). In conducting such review, the allegations of the complaint are "treated as true" and the facts are viewed in the light most favorable to the plaintiffs. *Rollings v. Shelton*, 286 N.C. App. 693, 696, 882 S.E.2d 70, 72 (2022); *see also Robertson v. City of High Point*, 129 N.C. App. 88, 90, 497 S.E.2d 300, 302, *disc. rev. denied*, 348 N.C. 500, 510 S.E.2d 654 (1998) ("[A] motion to dismiss for failure to state a claim upon which relief may be granted is addressed to whether the facts alleged in the complaint, when viewed in the light most favorable to the plaintiffs, give rise to a claim for relief on any theory." (citation and internal quotation marks omitted) (cleaned up)).

"A complaint should not be dismissed under Rule 12(b)(6) unless it affirmatively appears that [the] plaintiff is entitled to no *relief under any state of facts which could be presented in support of the claim*." *Norton v. Scot. Mem'l Hosp., Inc.*, 250 N.C. App. 392, 399, 793 S.E.2d 703, 709 (2016) (citation and internal quotation marks omitted); *see also Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 225, 695 S.E.2d 437, 440 (2010) (providing that granting of a Rule 12(b)(6) motion is appropriate only "if it appears certain that [the] plaintiffs could prove no set of facts which would entitle them to relief under some legal theory[,]" or "no law exists to support the claim made . . . ." (citations omitted)). In *Norton*, applying our relevant scope of review to the trial court's dismissal under Rule 12(b)(6) of the plaintiffs' claim for intentional infliction of emotional distress ("IIED"), we reversed the trial court's order, and provided the

> [p]laintiffs' IIED claims may later be determined to be insufficient to go to the jury, but that issue is not before us. Based solely upon the allegations on the face of their complaint, [the p]laintiffs should be provided the opportunity, afforded by the Rules of Civil Procedure, to discover and "to disclose more precisely the basis of both the claim and defense and to define more narrowly the disputed facts and issues." The trial court's dismissal under Rule 12(b)(6) of [the p]laintiff's IIED allegation against [the defendant] was premature, and is reversed.

250 N.C. App. at 400, 793 S.E.2d at 709 (citing *Pyco Supply Co., Inc. v. Am. Centennial Ins. Co.*, 321 N.C. 435, 443, 364 S.E.2d 380, 384 (1988)).

A plaintiff sufficiently states a claim for breach of contract when he alleges, "(1) the existence of a contract between [the] plaintiff and [the] defendant, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the amount of damages resulting to [the] plaintiff from such breach." *Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108–09, 834 S.E.2d 404, 418 (2019) (citing *RGK, Inc. v. U.S. Fid. & Guar. Co.*, 292 N.C. 668, 675, 235 S.E.2d 234, 238 (1977)).

Here, under the scope of our Rule 12(b)(6) review, it is our duty to determine only whether Plaintiffs' allegations, on the face of their Complaint, are sufficient to state a claim for breach of contract. *See Thomas*, 892 S.E.2d at 891; *see Norton*, 250 N.C. App. at 400, 793 S.E.2d at 709. Treating the allegations in Plaintiffs' Complaint as true, and viewing the facts in the light most favorable to Plaintiffs, Plaintiffs made such allegations that they sufficiently stated a claim for breach of contract. *See Rollings*, 286 N.C. App. at 696, 882 S.E.2d at 72; *see Robertson*, 129 N.C. App. at 90, 497 S.E.2d at 302.

As to the existence of a contract, Plaintiffs' Complaint alleged that the "Enrollment Agreements were valid contracts" between Plaintiffs and Defendants, which "included the Parent-School Partnership." *See Intersal, Inc.*, 373 N.C. at 108–09, 834 S.E.2d at 418. As to the specific provisions breached and the facts constituting the breach, Plaintiffs' Complaint further alleged that Defendants violated the "binding promise to educate the children during the 2021–22 school year" and the agreement to uphold and enforce rules "in a fair, appropriate and equitable

3

manner[,]" because Plaintiffs were punished for exercising their ability to "involve the appropriate administrator . . . when a question/concern arises . . . ." *See id.* at 108–09, 834 S.E.2d at 418. As to the damages incurred resulting from the breach, the Complaint alleged that Plaintiffs incurred compensatory damages, "including but not limited to actual damages equating to the loss of their payment and tuition and fees for the 2021–22 school year[,]" and consequential damages "incurred as a result of being compelled, without prior notice, to change their children's schools a few weeks into the new 2021–22 school year." *See id.* at 108–09, 834 S.E.2d at 418.

Treating these factual allegations as true, Plaintiffs sufficiently stated a claim for breach of contract, because they alleged: (1) the existence of a contract; (2) the particular provisions breached; (3) the facts constituting breach; and (4) the amount of damages resulting from such breach. *See Intersal, Inc.*, 373 N.C. at 108–09, 834 S.E.2d at 418. While Plaintiffs' Complaint did not address the provision of the contract governing the possibility of disenrollment, viewing the alleged facts as true and in a light most favorable to Plaintiffs, the allegations demonstrate specific contractual guarantees that Plaintiffs claim were violated by Defendants, which is all that is required to sufficiently state a claim for breach of contract. *See id.* at 108–09, 834 S.E.2d at 418.

As provided by the majority, "North Carolina courts recognize that freedom of contract is constitutionally guaranteed and provisions in private contracts, unless contrary to public policy or prohibited by statute, must be enforced as written." *Ricky*

4

*Spoon Builders, Inc. v. EmGee LLC*, 286 N.C. App. 684, 691, 882 S.E.2d 110, 115 (2022), *disc. rev. denied*, __ N.C. __, 891 S.E.2d 300 (2023) (citation and internal quotation marks omitted) (cleaned up).  Although the majority assesses Plaintiffs' conduct as making impossible a "positive, collaborative working relationship between the School[,]" or alternatively, as "seriously interfer[ing] with the School's mission[,]" such that Defendants were justified in their termination of Plaintiffs' enrollment contracts, I conclude that this determination is premature as it necessarily involves findings of fact.  At this stage in the proceeding and under our scope of review of a trial court's Rule 12(b)(6) dismissal of a claim, treating the factual allegations *as true* and viewing them *in the light most favorable to Plaintiffs*, it is this Court's duty *only* to determine whether Plaintiffs presented allegations such that they sufficiently stated a claim for breach of contract.  It is not within our appellate purview to determine at this stage in the proceeding whether Defendants were justified in their termination of Plaintiffs' enrollment contracts.  *See Thomas*, 892 S.E.2d at 891; *see Rollings*, 286 N.C. App. at 696, 882 S.E.2d at 72; *see Robertson*, 129 N.C. App. at 90, 497 S.E.2d at 302.

As set forth above, I conclude Plaintiffs sufficiently stated a claim for breach of contract, and therefore conclude that the trial court's dismissal under Rule 12(b)(6) of Plaintiffs' breach of contract claim against Defendants was premature.  *See Intersal, Inc.*, 373 N.C. at 108–09, 834 S.E.2d at 418; *see Norton*, 250 N.C. App. at 400, 793 S.E.2d at 709.  Plaintiffs "should be provided the opportunity, afforded by

the Rules of Civil Procedure, to discover and to disclose more precisely the basis of both [the] claim and defense and to define more narrowly the disputed facts and issues[,]" and I would thus reverse and remand the trial court's order as to Plaintiffs' breach of contract claim. *Norton*, 250 N.C. App. at 400, 793 S.E.2d at 709 (citation and internal quotation marks omitted). For these reasons, I respectfully dissent.